[Crim. No. 2115. Second Appellate District, Division Two.—March 23, 1932.]

THE PEOPLE, Respondent, v. WENDELL M. CONKLIN, Appellant.

Frederic H. Vercoe, Public Defender, and G. A. Benedict, Deputy Public Defender, for Appellant.

U. S. Webb, Attorney-General, James S. Howie, Deputy Attorney-General, Buron Fitts, District Attorney, and Frank Stafford, Deputy District Attorney, for Respondent.

WORKS, P. J.—Defendant was convicted under a charge that he had violated the provisions of section 288a of the Penal Code, which denounces the crimes sometimes known as fellatio and cunnilingus, the section being couched, however, in English. Defendant appeals from the judgment and from an order of the trial court denying his motion for a new trial.

The alleged victim of appellant was a boy nearly twelve years of age, and it is contended that he was an accomplice of appellant in the commission of the acts concerning which he testified as a witness for the prosecution. It is also insisted that the testimony of the boy is without corroboration in the record, whereas a corroboration of the testimony of an accomplice is necessary under the law in order to convict one charged with crime.

We shall first inquire whether the boy's story was corroborated. On a certain evening the boy's parents, Mr. and Mrs. F., were visited by appellant and his wife, the boy having arrived home soon after the visitors came. The four elders had been drinking intoxicating liquors before the

boy's arrival and continued to do so afterward. The first liquor used was whisky and the drinkers then resorted to beer. After a supply of the latter became invisible someone suggested that more of it would be acceptable, and Mrs. F. then said that more was to be found in a locked chicken-house at the back of their lot and dispatched the boy for it. Appellant followed him, possibly for the purpose of aiding in the transportation of the beer to the house, possibly with a more sinister object. The liquor was taken from the chicken-house and deposited on the ground while the structure was being relocked. The boy testified that then, at the request and under the direction of appellant, the alleged offense was committed, giving the details. He says that the act lasted ''not very long; my mother came out then''.

We now turn to the testimony of the mother, Mrs. F. She said that while she was in the house talking to appellant's wife, her husband having gone to bed as he had to arise at 3 in the morning, ''all of a sudden it came to me that the boy had been gone an awfully long time''. Her testimony then proceeds: ''Q. How long had he been gone up until that time? A. About 20 minutes, I imagine, or longer. So I just rushed out the front door and ran around the house and down the driveway; and then I got to the front of the garage. . . . I could see Mr. Conklin's white sweater; and he was in a stooping position, and the boy was either getting up or getting down, I couldn't say which. . . . Q. Did you go over to them, then? A. And I said, 'What is going on here? What are you doing?' And Mr. Conklin seemed to be in a very excited mood. He said, 'What do you mean? What do you mean? Nothing; nothing.' And I said, 'Well, you come in the house and we will see what this is all about,' and he hauled off and hit me, and broke the bone here of my nose; and I guess I clutched him and got him by the hair; and we went into the house and I called my husband to get up—what had happened—and Mrs. Conklin said, 'What is the matter, Marie?' And I said—well, I said, 'Mr. Conklin'— Q. Was Mr. Conklin present at that time? A. Yes. I said: 'He has had the boy out there in the back yard, and he had him down on the ground.' And she said, 'Oh, Marie, I can't believe anything like that; I can't believe anything like

that.' And I said, 'Well, I saw it with my own eyes; I saw him have him down, and he wouldn't give me any explanation.' . . . Well, then I said—I kept calling my husband, and he wanted him to wait until he got his clothes on; and I said, 'I want to get the police here.' She said—Mrs. Conklin said, 'Oh no; do not get the police,' and my husband said to him: 'Well, then, be a man and wait until I get my clothes on and we will straighten this out.' But Mr. Conklin was trying to get away all this time and I was trying to hang on to him. . . . Well, I had hold of him; and I had hold of his hair part of the time, and part of the time hold of his clothes; and Mrs. Conklin had hold of me; and he was trying to pull her. He said, 'Let us get out of here; let us scream'; that is the exact words. . . . In the meantime, he had gotten away from me—that hold that I had had on him—and he got out in the front yard, and my husband was after him. Well, he hit my husband, and my husband knocked him down; and they scrambled back and forth; and Mrs. Conklin was trying to get out, and I had hold of her. So they finally got away.'' At another place the witness said that she did not know the condition of the boy's clothing when she got out to where appellant and the boy were, as she did not examine him. On cross-examination she testified: ''Q. Mrs. F. . . . , you said something that—after you got into the house you made some remark, that he had the boy down on the ground. Now, you never did accuse this defendant directly of having done anything to your boy, did you? A. No; I asked him what was going on out there . . . Q. . . . And you never did tell the defendant directly during that conversation, that entire evening, that he had done anything to the boy, did you? A. Well, I don't know if I said anything to him directly. I said it; I was telling my husband about it, and I was telling his wife; there was such a rumpus and a scuffle around it is hard to tell whether it was talking directly to one person or not. . . . I said it in his presence, yes, because we were all in the front room. Q. Well, you said at the preliminary hearing that you didn't know whether it was in his presence or not, didn't you? A. Yes, I did, but everything happened so quickly then; I thought of a lot of things afterwards. Q. Did you ever ask the boy, in the presence of the defendant, what had hap-

pened out in the back yard? A. Well, I couldn't say if it was in his presence or not. . . . Q. Did the boy say anything to you while you were in the back of the lot? A. No, he did not, but he started crying and I knew there was something wrong if he started crying. . . . Q. Mrs. F. . . . , you didn't see the defendant do anything to your boy, as regards his private parts, did you? A. No, I did not. Q. And you did not know, even when you got back into the house, if it ever happened, that it had happened, did you? A. Not until I questioned the boy, but I had— Q. Well, you don't know whether that was while the defendant was there or afterwards? A. Well, I think it was while they were scuffling. I could not say for sure as to about that time. . . . Q. Mrs. F., . . . you say you did not examine the clothing of your little son at all? A. No. Q. And you didn't know that there were, if there were, any of the buttons on his pants unbuttoned, did you? A. No. Q. You didn't look at it? A. No. Q. Did you examine it? A. No. Q. Even after you went into the house? A. No."

One of the arresting officers testified that about 3 o'clock in the morning of the night in question he and a fellow officer approached the apartment occupied by the appellant; that they stood outside and heard a conversation going on inside the apartment; that thereupon he knocked on the door and announced that he was a police officer, whereupon the conversation ceased; that he told the occupants several times that he was an officer and wanted to talk to them, but the door was not opened; that he then called the landlady but she was unable to unlock the door for the reason that the key had been turned from the inside; that finally he succeeded in working the key out and unlocking the door and found appellant and his wife "apparently asleep"; that he then told appellant to get up and put on his clothes, as he had a serious accusation against him. The appellant then inquired what it was all about, according to the testimony of the witness, and was informed that it was for a violation of section 288a of the Penal Code, to which statement appellant responded by saying, "I know about that," or "I know what that is." The officer further testified that he "kept asking" appellant "to get up, and he refused". Finally they tried "to pull him out", whereupon

appellant jumped up and ran into the bathroom. The officers followed and finally after the landlady talked to appellant he submitted to arrest.

The question whether the testimony of the mother and of the arresting officers furnished any corroboration of the story of the boy we think is settled by *People* v. *Morton,* 139 Cal. 719 [73 Pac. 609, 611], *People* v. *Robbins,* 171 Cal. 466 [154 Pac. 317, 319], and *People* v. *Kempley,* 205 Cal. 441 [271 Pac. 478], although additional cases might be cited on the subject. In *People* v. *Morton* the Supreme Court said, the italics being employed by that tribunal: ''The corroboration of an accomplice required by law in order to warrant a conviction upon his testimony must tend *pertinently* to connect the accused with the offense. Corroboration as to matter having *no tendency in this direction,* however thorough and complete, will not suffice. (*Welden* v. *State,* 10 Tex. App. 400.) In that case the court further said: 'We suggest this mode as a proper test: eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be inculpatory evidence—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him.' In *Sims* v. *State,* 8 Tex. App. 230, the rule is thus stated: 'The evidence must tend directly and immediately to connect the defendant with the commission of the offense.' In New York, under the same code provision (Code Crim. Proc., sec. 399), it was said: 'The corroboration, however strong in all other respects, must point to the connection of the defendant with the *commission of the crime* to be of any avail.' (*People* v. *Ryland,* 28 Hun (N. Y.), 568, 570.)'' It is remarked in the opinion in *People* v. *Robbins, supra:* ''The rule in this behalf is well and tersely stated in 12 Cyc., at page 456, where it is said: 'It is necessary that the evidence corroborating an accomplice shall connect or tend to connect the defendant with the commission of the crime. Corroborative evidence is insufficient where it merely casts a grave suspicion upon the accused. It must not only show the commission of the offense and the circumstances thereof, but must also im-

plicate the accused in it. . . . But where the circumstances when proved, taken separately or collectively, are consistent with the innocence of the accused, there is no corroboration, and a verdict of conviction thereon will be set aside.'" The case of *People* v. *Kempley, supra,* contains an exhaustive treatment of the subject of corroboration of accomplices, a part of which only will here be quoted. The italics are those of the court: "The law of this state on the question of corroboration is now well settled. The statutory rule is found in section 1111 of the Penal Code, which provides: 'A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.' This code rule has been the same since its adoption as a part of the Criminal Practice Act in 1851. In the early case of *People* v. *Ames,* 39 Cal. 403, it was said that the purpose of the statute 'was to prohibit a conviction unless there was *some* evidence, entirely exclusive of that of the accomplice, which, of itself and without the aid of an accomplice, tended to raise at least a suspicion of the guilt of the accused.' In the later case of *People* v. *Thompson,* 50 Cal. 480, this court was at pains to point out that the language of *People* v. *Ames, supra,* should not be taken as a correct statement of the rule, and that it was not intended to lay down a rule 'that if the corroborating evidence sufficed to raise merely a *suspicion* of the defendant's guilt, and nothing more, that it would be a sufficient corroboration within the meaning of section 1111'. (*People* v. *Thompson, supra,* p. 482.) In *People* v. *McLean,* 84 Cal. 480 [24 Pac. 32], it was said: 'But although more is required by way of corroboration than to raise a mere suspicion (see *People* v. *Thompson,* 50 Cal. 480), yet the corroborating evidence is sufficient if it, of itself, tends to connect the defendant with the commission of the offense, although it is slight, and entitled, when standing by itself, to but little consideration.'" The court said on a later page: "Upon a consideration of the entire record we are compelled to state that when the testimony of an accomplice is eliminated from the case, as it must be, for the purpose of determining the question of corroboration (*People* v.

*Robbins, supra;* 8 Cal. Jur. 178, and cases cited), the other evidence in the case has no substantial connection with any crime, is as consistent with innocence as with guilt, and that it is questionable whether it raises even a suspicion of guilt.''

Measuring the question by the rule enunciated by the foregoing authorities, it is plain to us that the corroborating evidence was sufficient. Nor are we unmindful in making this statement that the case here involved is essentially different from those in which the commission of the offense by *someone* is amply demonstrated by testimony other than that given by the accomplice. And we here add parenthetically that if this distinction be noted in the various cases much of the apparent confusion will disappear. But here it cannot be said, eliminating the testimony of the accomplice, that the testimony is as consistent with the innocence of the defendant as with his guilt. It may be that the position of the two when first discovered by the mother can be explained away. But why did the boy start immediately to cry unless something was wrong? Why did the defendant become so excited as the testimony of the mother reveals him to have been? Why, when he was confronted with the accusation made by Mrs. F. to appellant's wife in his presence and while she had hold of his hair, did he not protest his innocence? Why did he feign sleep when the officers first gained admission to his room, as well as seek refuge in the bathroom? Why, when he was called upon for an explanation in the back yard, if he was innocently in the position described, did he not explain instead of exclaiming, ''What do you mean; what do you mean? Nothing; nothing.''? At no time did he state a reason for the compromising position, but rather he not only hit the father but also struck and broke the bone of the mother's nose. We deem the corroborating evidence to be ample.

It now becomes necessary to inquire whether the boy was an accomplice. In 1915 [Stats. 1915, p. 760] the legislature, departing materially from the then existing rule of judicial decision (see *People* v. *Coffey,* 161 Cal. 433 [39 L. R. A. (N. S.) 704, 119 Pac. 901]), amended section 1111 of the Penal Code by adding the following sentence thereto: ''An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the

defendant in the cause in which the testimony of the accomplice is given.'' The boy in the present case whose person was violated, as it is claimed by the prosecution, could not have been prosecuted for any offense whatever because of the submission of his person to the alleged criminal assault of appellant, unless he participated in the act with criminal intent. The rule is thus stated in the case of *People* v. *Dong Pok Yip*, 164 Cal. 143, 146 [127 Pac. 1031]: ''We are of the opinion, however, that the evidence falls short of showing that the boy actually and knowingly consented to be the victim of the alleged assault. It may be admitted that the evidence shows that the boy was ignorantly indifferent and passive in the hands of the defendant, even to the point of submission; but there is a decided difference in law between mere submission and actual consent. Consent, in law, means a voluntary agreement by a person in the possession and exercise of sufficient mentality to make an intelligent choice, to do something proposed by another. 'Consent' differs very materially from 'assent'. The former implies some positive action and always involves submission. The latter means passivity or submission, which does not include consent. (*Geddes* v. *Bowden*, 19 S. C. 1, 7; *Aull* v. *Columbia N. & L. R. Co.*, 42 S. C. 431 [120 S. E. 302]; Bouvier's Law Dict.) In cases of the character under discussion the age and mentality of the subject of. an indecent assault is important, and should always be considered in determining the presence or absence of consent. The mere submission of a child of tender years or retarded mental development to an attempted outrage of its person should not in and of itself be construed to be such consent as would, in point of law, justify or excuse the assault. (2 Bishop's New Criminal Law, sec. 35, subd. 2.) It is neither unreasonable nor unnatural to assume that such a child, in the hands of a strong man, might be easily overawed into submitting without actually consenting. (*Hill* v. *State,* 37 Tex. Cr. 279 [66 Am. St. Rep. 803, 38 S. W. 987, 39 S. W. 666].)'' To the same general effect reference may also be had to *People* v. *Camp,* 26 Cal. App. 385 [147 Pac. 95], where attention is called to section 26 of the Penal Code wherein it is said that all persons are capable of committing crimes with certain exceptions, among whom subdivision 1 specifies: ''Children under the

age of fourteen in the absence of clear proof that at the time of committing the act charged against them they knew its wrongfulness. . . . '' An instruction was given in the instant case defining the law as set forth in *People* v. *Dong Pok Yip, supra,* and while it is true that the boy said he knew it was wrong, nevertheless bearing in mind that he was not yet twelve years old and of course had not arrived at the age of puberty, together with his remaining testimony, we are satisfied that there was sufficient testimony under the rule to justify the jury in concluding that his was an ''assent'' and not a ''consent''.

The attorney-general asks us to determine that the boy was not an accomplice under the authority of *People* v. *Johnson,* 115 Cal. App. 704 [2 Pac. (2d) 216], but the conclusion to which we have come renders any discussion thereof unnecessary.

■ Appellant also complains because the court, deeming an instruction erroneous, withdrew it from the jury and gave in its stead one concerning which no complaint is made. He urges that the harm could not thus be undone and further that the withdrawal was not unqualified. We cannot agree that the withdrawal was not absolute. The trial judge definitely and positively told the jury to disregard it entirely and to pay attention to the one given in its place. While the practice is not to be commended, it is apparent that the impression made upon the jury was to fix in their mind the true rule rather than the reverse. We can find no prejudicial error in the point.

■ In the general instruction to the jury concerning the credibility of witnesses the court, very patently by inadvertence, left in the following: ''A witness may also be impeached by proof that he has been convicted of a felony.'' The appellant assigns the same as error. Undoubtedly the words should not have been used, there being no testimony that any witness had ever been convicted; but we must conclude that this is one of those cases where an inapplicable instruction could do no harm. The jury as reasonable men and women could not possibly have found a place to apply it. Furthermore, it was not and could not have been directed toward the appellant.

■ Complaint is also made of an instruction which it is argued constituted a formula instruction and therefore was

faulty because it failed to state all of the conditions necessary to a verdict. It did not, however, purport to be a complete statement of the law of the case. The thing of which appellant complains, to wit, that it included no reference to the kind of evidence necessary to corroborate an accomplice, reveals the weakness of his argument. The jury had been fully instructed upon this subject as well as upon the question of who are accomplices, and, as men and women of common intelligence, could not have misunderstood or misapplied the instruction.

Other errors are assigned, all of which have been fully considered. A further discussion of them would serve no useful purpose.

Judgment and order affirmed.

Craig, J., and Thompson (Ira F.), J., concurred.