[Crim. No. 2792.   Second Appellate District, Division One.—February 29, 1936.]

## THE PEOPLE, Respondent, v. OTIS WILLIAMS, Appellant.

Torrence C. Welch and Peter J. Youngdahl for Appellant.

U. S. Webb, Attorney-General, and Bayard Rhone, Deputy Attorney-General, for Respondent.

HOUSER, P. J.—From a judgment of conviction on each of three counts of an information, which contained an accusation of the commission by him of the offense defined in section 288a of the Penal Code, as well as from an order by which his motion for a new trial was denied, defendant has appealed to this court.

With reference to counts 1 and 3 of the information, the prosecuting witness was a boy of the age of about twelve and one-half years; and it is urged by appellant that if the crime of which defendant was accused in said counts was actually committed, the boy was an accomplice of defendant; and that since the testimony that was given by the boy was not corroborated as is required by section 1111 of the Penal Code, it should follow that the evidence adduced on the trial of the action did not support the judgment as to either of said counts.

Whether the boy was legally capable of being an accomplice in the commission of the crime depends principally upon the provisions of subdivision 1 of section 26 of the Penal Code, which is to the effect that ''in the absence of clear proof that at the time of committing the act . . . [he] knew its wrongfulness'', he was incapable of committing the offense.

In cases that have been decided by the appellate tribunals of this state, the language employed in the respective opinions therein with reference particularly to the state of mind of a child of tender years who has been either the victim, or a consenting participant, in a crime of the nature of that denounced by the provisions of the instant pertinent statute, indicates that to justify the legal conclusion that the child was an accomplice of the defendant in the action, the "proof" must have been "clear" not only that the child understood the "nature and effect" of the act that constituted the offense; that the act was "forbidden"; that if he were to commit it, he would be punished; but intimates also that if he committed the offense, he must have been conscious at that time that "within the meaning obviously intended by the code", he was committing a "wrongful" act. (*People* v. *Becker,* 140 Cal. App. 162 [35 Pac. (2d) 196].) It also has been held that, for the purpose of adjudging a child an accomplice in the commission of the offense, it will not suffice that the child "was ignorantly indifferent and passive in the hands of the defendant, even to the point of submission"; but it must be affirmatively established that the "boy actually and knowingly consented to be the victim of the alleged assault". (*People* v. *Dong Pok Yip,* 164 Cal. 143 [127 Pac. 1031].) Furthermore, in order to constitute the child an accomplice in the perpetration of the crime it must appear by "clear proof" that he was possessed of "knowledge of good and evil and had sufficient mental capacity to discern the moral quality of defendant's said conduct". (*People* v. *Camp,* 26 Cal. App. 35 [147 Pac. 95].)

In the case of *People* v. *Conklin,* 122 Cal. App. 83, 92 [10 Pac. (2d) 98], it was ruled that although it was true that the boy in that case said that he "knew it was wrong, nevertheless bearing in mind he was not yet twelve years old and of course had not arrived at the age of puberty, *together with his remaining testimony,* . . . there was sufficient testimony . . . to justify the jury in concluding that his was 'assent' and not 'consent' ".

In the instant case, the following excerpts of the testimony that was given by the boy illustrate not only his general knowledge, but particularly his appreciation of the "wrongfulness" of what he and the defendant had been doing at the time or times in question, to wit:

"Q. He [defendant] did not say anything to you at that time, or do anything out of the way? A. Yes. Q. You know what I mean by 'out of the way'? A. Yes, sir. Q. What do I mean? . . . A. Well it means like saying bad things. Q. . . . And this thing you called funny stuff? A. Yes. Q. You know that when I say 'out of the way' don't you?. A. Yes, sir. Q. By the way, son, do you know that the thing that Otis [defendant] did there is *a very wicked thing?* A. Yes. Q. And a *very wrong thing?* A. Yes, sir. Q. You knew that *when he did that to you,* didn't you? A. Yes, sir. Q. Had your mother ever taught anything about anything of that kind being wrong and wicked? A. Yes. Q. Had you been taught in Sunday school, that it was wrong and wicked to do things like that? A. Yes. Q. When was the first time that Mr. Williams did something that was wrong? A. Around June the 12th. . . . Q. What was the first thing that he said to you that you thought was improper? A. Well, he told me 'How about some funny stuff?' I don't know. Q. When he said that, you knew what he meant? A. Yes, sir. . . . Q. What led you to know then what he meant when he said 'How about some funny stuff?' A. I don't know, but I just knew what he meant. . . . Q. Or was it the morning when you went to Sunday school? A. I don't think we talked; I think it was another morning that we talked about it. Q. Then you boys decided you were going over to Mr. Williams' house? A. Mr. Williams saw this [other boy], and he told me to bring him over. Q. You went over there for that purpose, didn't you, son? A. Yes. . . . Q. Charlie, isn't it a fact that you said to Mr. Williams, 'Why don't you do the same thing to [the other boy] that you did to me?' A. Yes. . . . Q. And you told me yesterday that when these things happened, *you knew they were very wrong?* A. Yes, sir. . . . Q. By Mr. Mc-Cormick: Now, Charles, at the time that this terrible thing happened first, you have told us that *you knew it was wrong?* A. Yes. Q. *Did you know you were committing a crime at that time?* A. Yes. Q. *You did?* A. Yes. Q. Where had you heard that? A. I go to picture shows, and I see how they are at times. . . . Q. By Mr. McCormick: What did you think was wrong about it, Charles? A. *I just thought it was dirty.* Q. You just felt that *it was a dirty thing to do?* A. Yes. Q. It sort of was out of the ordinary

for you, wasn't it? A. Yes. Q. And *you just naturally re-volted at it?* Do you know what that means? A. Yes, but I don't know how to explain it. Q. You know what it is not to like something? A. Yes. Q. Did you like that? A. No, sir. Q. You didn't, did you? A. No, sir. Q. *And it was not not liking that made you think it was wrong?* A. No, sir. Q. What was it that made you think it was wrong? A. *I think it was bad to do that.* Q. Did you think you were doing *something bad?* A. Yes. Q. *Why did you do it, Charles?* A. *Because he paid me.* Q. *Because he paid you for it?* A. *Yes, sir.*"

It may thus be noted that the "proof" with respect to the knowledge of the boy regarding the "wrongfulness" of the act discloses the general fact that considering his age the boy was more than ordinarily advanced. His apparent under-standing of the general situation and his replies to questions that were propounded to him, in point of mental ability would reveal the existence of an intellect that would be not of discredit to an average person of mature years. Indeed, his directness and clarity of expression might be regarded as extraordinary. If not an "infant prodigy", he well might be regarded as a "precocious youngster". In particular, from his testimony it appears that at the outset, and before anything in the nature of a direct criminal act had occurred between the boy and defendant, the former had a clear under-standing of the significance of the expression "funny stuff", which was included within the language employed by defend-ant in his overture to the boy; that both at that time and at all times thereafter the boy knew that the act that was con-templated by defendant was "a very wicked thing; . . . a very wrong thing"; that theretofore he had been told, both by his mother and "in Sunday school, that it was wrong and wicked to do things like that"; that he thought "it was bad to do that"; that "it was dirty"; and that he "just naturally revolted at it"; that thereafter Mr. Williams (defendant) saw the (other boy); and "he (defendant) told me to bring him (the other boy) over"; that thereafter the prosecuting witness and the other boy went "over" for "that" purpose; that it was at the suggestion of the prosecuting witness that the other boy was procured. In that connection, it appears that the prosecuting witness said to defendant, "Why don't you do the same thing to (the other boy) that you did to

me?" ·And finally, that although the prosecuting witness knew that he was *"committing a crime at that time"*, the reason he participated in the act was "because he (defendant) paid me".

In the absence of that part of the record hereinbefore set forth it would be extremely difficult for the respective members of this court to believe that a boy of the age of twelve and one-half years could have more than a hazy conception of a situation that not only included actual commission of the act that is the subject of the present inquiry, but as well could recognize the fact that such an act was such a radical departure from moral rectitude that its commission had been denounced by statute as constituting a criminal offense; and yet, measured by the substance of the excerpts of the testimony to which reference hereinbefore has been had, no conclusion may be reached other than that "at the time of committing the act charged . . . (the boy) knew its wrongfulness" (subd. 1, sec. 26, Pen. Code); and was thoroughly acquainted with the criminal consequences that would or might result from the commission of such an act. Since by his own testimony, or, as required by the provisions of the statute, by "clear proof", he established the ultimate fact that he was "capable of committing crimes" (subd. 1, sec. 26, Pen. Code), and especially the criminal offense which forms the basis for the prosecution of defendant herein, it should follow that the boy was an accomplice of defendant, and hence that in the absence of evidence by which the testimony given by the accomplice was corroborated (sec. 1111, Pen. Code), in the contemplation of the law applicable to such a situation, defendant did not have a fair trial as to counts 1 and 3 of the information.

With reference more particularly to the judgment of conviction of defendant on count 2 of the information, it is contended by appellant that the trial court committed prejudicial error that affected the substantial rights of defendant, in that it refused his request to give to the jury each of two specified instructions. In that connection, since appellant has ignored the requirements specified in rule VIII of the Supreme Court and of the District Courts of Appeal, in that he has neither printed in his brief "all instructions given bearing upon the subjects covered by the refused instructions", nor "clearly stated the substance thereof, with cita-

tion to the line and page of the transcript where such instructions may be found'', this court is under no obligation to devote attention to the alleged error of which appellant complains. However, from an examination of such refused instructions, it appears that one of them contained an erroneous declaration of the law and that the other was at least argumentative. Hence (even waiving the rule), no error was committed by the trial court in refusing to give to the jury either of the criticized instructions.

█ Finally, appellant complains of certain specified misconduct by the deputy district attorney who was in charge of the prosecution of the action. Considering the argument made by the deputy district attorney to the jury, it may not be denied that the remarks to which appellant has directed attention are justly subject to adverse criticism. For the greater part, they were in the nature of a warning to the jury regarding the probable consequences of its failure to convict the defendant. Time and again the Supreme Court and appellate courts of this state have ordered the reversal of judgments in criminal cases because of similar misconduct on the part of district attorneys on the trials of such actions. However, generally, where such misconduct has resulted in a mistrial, it may be noted that at the very time when the misconduct occurred the attention of the trial court was specifically directed to it, and that thereby it was given an opportunity to correct the error or at least to reduce its adverse effect. But in the instant case it is noted that, as to remarks of a different nature, on two occasions only were objections interposed by defendant thereto, and that with reference to one of such remarks the jury was then and there properly instructed to disregard it in its deliberations. The other remark to which defendant objected was as follows:

''I think that the best possible evidence of this defendant's reputation is the testimony of his own character witnesses. Two or three of them had heard that he had been arrested and charged with similar conduct in 1926; they knew that this lofty work of his consisted of drawing nude and lascivious pictures of naked children—''

Following defendant's objection to the effect that there was no evidence in the record that there was any *lascivious* pictures, the judge of the trial court stated that if the district attorney in his argument went beyond the evidence or the

reasonable deductions to be drawn therefrom, the jury "are instructed to disregard that".

In view of the evidence that defendant was an artist, and that in the pursuit of his profession he did draw pictures of nude children, it is apparent that in characterizing the work of defendant as "lascivious", the deputy district attorney was not guilty of such misconduct that properly it could be said to seriously prejudice the substantial rights of defendant on the trial of the action. Nor were any of the other remarks of the deputy district attorney of the character that had the attention of the trial court been directed to them at the time of their utterance their effect, if any, upon the jury could not have been minimized, if not entirely eradicated. In the circumstances, it follows that on account of the alleged misconduct of the deputy district attorney the judgment cannot be reversed.

It is ordered that as far as the judgment and the order by which defendant's motion for a new trial was denied affect counts 1 and 3 of the information, they be, and they are, reversed. It is further ordered that as far as the judgment and the order by which defendant's motion for a new trial was denied. affect count 2 of the information, they be, and they are, affirmed.

Doran, J., concurred.

YORK, J., Dissenting.—Because of the misconduct of the district attorney, as specified by appellant, and because of the court's attitude towards such misconduct, I believe that a new trial should have been granted as to all counts.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 13, 1936.