[Crim. No. 6733. In Bank. May 8, 1961.]

THE PEOPLE, Respondent, v. VERGA OLIVER, Appellant.

*Assigned by Chairman of Judicial Council.

Robert L. Gardner, under appointment by the Supreme Court, for Appellant. Additional briefs were filed by the Appellant *pro se.*

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

DOOLING, J.—Defendant appeals from judgments of conviction of lewd and lascivious conduct with one Roger De Vries, a 2-year-old child (Pen. Code, § 288), and kidnaping said child (Pen. Code, § 207), following jury verdicts finding him guilty of both offenses.

On November 13, 1958, about 3:30 p. m. Roger's mother sent him to play in an alley behind their home. About that time a parking lot attendant found defendant sitting in a car on the lot and ordered him to leave. The attendant testified that defendant was "obviously drunk." At about 4 p. m. the attendant saw defendant walking down the alley leading Roger by the hand. About 5 p. m. a lady living in the area heard a baby crying and upon investigation found defendant and Roger sitting behind a 5-foot fence. Defendant had a bottle of liquor in his hand and was seated and leaning over Roger and talking to him. So far as she could observe both appeared to be fully clothed. Defendant's voice was "thick" and "unintelligent" and it appeared to her that defendant "was trying to soothe the baby." She immediately called the police.

Two officers arrived about 15 minutes later. They looked over the fence and saw Roger and defendant lying beside each other on the ground. Both were undressed from the waist down and the baby was crying. The officers observed that defendant had an erection and he was stroking the baby's right leg with his right hand. Defendant saw the officers and started to run, pulling up his trousers as he ran. The officers subdued him after a struggle. The defendant told the officers that he did not remember where he got the baby, it was "somewhere down the street." Defendant also said that "we were just up here playing with each other. He'd play with me, and then I'd play with him . . . but he guessed the baby didn't

want to anymore, so he was going to take him back home.''
The officers testified that defendant had been drinking but
was not intoxicated enough to justify his arrest for that
reason. ''It was second degree drunk.'' Defendant ''clearly
answered'' their questions but they could ''smell alcohol.''

The jury was properly instructed on the effect of intoxica-
tion as a defense to the charge of violating Penal Code, section
288, and although defendant testified that he was so drunk
that he could not remember the events of that afternoon, the
evidence was sufficient to support the jury's finding that
defendant was not so intoxicated that he could not form the
specific intent required by that section to establish his guilt.
[██] The facts above recited which the officers testified that
they observed upon looking over the fence were sufficient with-
out more to support the verdict of guilty of violating section
288. The fact that the sun had set and it was twilight cannot
be said to make the testimony of the officers so improbable that
the jury was not entitled to believe this testimony. There is
no basis in the record for defendant's claim, not joined in
by his appointed counsel, that there was perjured testimony,
and under the familiar rule any inconsistencies in the testi-
mony were for the jury to resolve.

The conviction of the charge of kidnaping presents a more
serious question. The trial court instructed the jury: ''To
constitute the crime of kidnaping . . . there must be a carry-
ing, or otherwise forcible moving, for some distance of the
person who, against his will, is stolen or taken into the custody
or control of another person. . . .

''This form of kidnaping does not involve as an essential
element any specific intent or purpose, as distinguished from
ordinary criminal intent, and hence proof of the intent or
purpose of the defendant, beyond criminal intent as defined in
my instructions, or that he had any certain purpose, is not
necessary to support a conviction.''

The jury was elsewhere instructed: ''The intent to do the
forbidden thing constitutes the criminal intent.''

So far as any evidence shows, the baby went willingly with
defendant. The parking lot attendant at 4 p. m. saw defend-
ant walking down the alley leading the baby by the hand.
Defendant and Roger were next seen by a witness about 5 p. m.
behind the fence where the officers also found them 15 minutes
later. ██ It is true that the baby was too young to give
his legal consent to being taken by the defendant. (*State* v.
*Hoyle*, 114 Wash. 290 [194 P. 976, 977] ; *John* v. *State*, 6 Wyo.

203 [44 P. 51, 53]; *State* v. *Farrar*, 41 N.H. 53, 59; Burdick, Law of Crime, vol. 2, § 392, p. 62; *cf. People* v. *Williams*, 12 Cal.App.2d 207, 209 [55 P.2d 223].) It is equally true that the forcible moving of a person against his will, where such person is capable of giving consent, is kidnaping under Penal Code, section 207, without more, and "[t]he purpose or motive of the taking and carrying away [is] immaterial in prosecutions for kidnaping." (*People* v. *Sheasbey*, 82 Cal. App. 459, 465 [255 P. 836]; see *People* v. *Bruno*, 49 Cal.App. 372, 374-376 [193 P. 511].) Counsel for defendant argues that the application of this rule to the case of a child too young to give a legal consent "could result in the conviction . . . of persons who merely escort a small child from point A to point B without a wrongful or any purpose." There is much force to this argument. Many situations readily suggest themselves under which a minor, unable to give his consent because of his immature years, might be forcibly taken and transported by an adult for a good or innocuous purpose, and in which it would be unthinkable that the adult should be held guilty of kidnaping. If I find a young child alone on the highway and take him into my automobile, whether he resists or goes with me passively, intending to transport him to a police station or to his home; if I find such a child at the edge of a body of water in which he might drown or at the edge of a precipice over which he might fall and seize him even brusquely, whatever his resistance, and forcibly carry him to a place of greater safety; if I find such a child on the sidewalk and take his hand and walk along with him out of friendliness or a fondness for children or any other innocent or innocuous reason with no malign or evil purpose, nobody could reasonably believe that it was the intention of the Legislature that for any of these acts I could be convicted of the crime of kidnaping. On the other hand, if I find such a child under any of the supposed circumstances and transport him in exactly the same manner with an evil and unlawful intent, everybody would equally agree that my conviction of kidnaping would fall within the legislative purpose.

Similar instances as readily suggest themselves in which the intent with which an adult person, who by reason of extreme intoxication, delirium or unconsciousness from injury or illness is unable to give his consent, is forcibly carried by another, should determine whether such forcible carrying is or is not kidnaping within the legislative purpose. If I

forcibly carry a helplessly intoxicated man lying in the middle of the highway to a place of greater safety, if I forcibly take a delirious man or one who is unconscious to a hospital or to a doctor, nobody again could reasonably believe that it was the intention of the Legislature that for any of these acts I could be convicted of kidnaping. But if I forcibly take one of such persons and carry him in the same manner for an evil and unlawful purpose, everybody would again agree that my conviction of kidnaping would fall within the legislative design.

The rule governing the forcible carrying of conscious persons capable of giving consent, which makes a person who forcibly carries such a person and transports him against his will guilty of kidnaping, however good or innocent his motive or intent may otherwise be, can only lead to obvious injustice and a perversion of the legislative purpose if blindly and literally applied where the person who is forcibly transported, because of infancy or mental condition, is incapable of giving his consent. The courts are not powerless to read exceptions into the law when confronted by a criminal statute which literally interpreted would lead to the conviction of crime in cases to which it is obvious that the Legislature cannot have intended the statute to apply.

The governing rule of construction in cases of this character was stated by this court in *Ex parte Lorenzen,* 128 Cal. 431, at pages 438-440 [61 P. 68, 79 Am.St.Rep. 47, 5 L.R.A. 55] : ''[I]t is to be remembered that the letter of a penal statute is not of controlling force, and that the courts, in construing such statutes, from very ancient times have sought for the essence and spirit of the law and decided in accordance with them, even against express language; and in so doing they have not found it necessary to overthrow the law, but have made it applicable to the class of persons or the kind of acts clearly contemplated within its scope. The rule was thus early expressed in Bacon's Abridgment: 'A statute ought sometimes to have such an equitable construction as is contrary to the letter.' The oft-cited instance of the Bologna law, which enacted that whoever drew blood in the streets should be punished with the utmost severity, was wisely held not to apply to the barber who opened the veins of a sick man to aid in his cure. The statute of Edward II, declaring guilty of a felony any person who broke prison, was held upon considerations of the most ordinary common sense not to apply to one who did so to escape from a burning jail. The law

declaring it a felony to lay hands upon a priest, by the same principles of common sense reasoning, was held not to apply to one who did so by way of kindness or warning, but only to those who acted with illegal or improper intent. In *United States* v. *Kirby*, 7 Wall. (U.S.) 482 [19 L.Ed. 278], the act provided: 'That if any persons shall knowingly and wilfully obstruct or retard the passage of the mail, or of any driver or carrier, etc., . . . for every such offense shall pay a fine not exceeding one thousand dollars.' A mail carrier was arrested by a state officer on an indictment for murder. The act came within the letter of the law. Mr. Justice Field, delivering the opinion of the court, discusses the exemption of mail carriers from detention under civil processes, but declares that they are liable to arrest and detention under criminal process for acts *malum in se.* Therefore, notwithstanding the fact that the defendant had 'knowingly and wilfully' retarded the mail carrier, it is said: 'When the acts which create the obstruction are in themselves unlawful, the intention to obstruct will be imputed to their author, although the attainment of other ends may have been the primary object. The statute has no reference to acts lawful in themselves, from the execution of which a temporary delay to the mail unavoidably follows. . . . All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice or oppression or an absurd consequence. It will always be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter.' . . . In *Holmes* v. *Paris,* 75 Me. 559, it is said: 'It has been repeatedly asserted in both ancient and modern cases that judges may in some cases decide upon a statute even in direct contravention of its terms.' In all of these cases the apparent defect of the statute is cured by making it apply according to its spirit to the act in its nature illegal or fraudulent.'' (Citing and following *Ex parte Lorenzen, supra,* see: *People* v. *Ventura Refining Co.,* 204 Cal. 286, 290-292 [268 P. 347, 283 P. 60] ; *Ex parte McClain,* 134 Cal. 110, 111-112 [66 P. 69, 86 Am.St.Rep. 243, 54 L.R.A. 779] ; *Southern Pacific Co.* v. *Robinson,* 132 Cal. 408, 420 [64 P. 572, 12 L.R.A. N.S. 497] ; *People* v. *Kelley,* 27 Cal. App.2d Supp. 771, 774-775 [70 P.2d 276] ; *In re Hayes,* 134 Cal.App. 312, 317 [25 P.2d 230] ; *People* v. *Kaufman,* 49 Cal. App. 570, 574 [193 P. 953] ; *People* v. *Earl,* 19 Cal.App. 69, 71-72 [124 P. 887].)

 Penal Code, section 207, as applied to a person forcibly taking and carrying away another, who by reason of immaturity or mental condition is unable to give his legal consent thereto, should, following the rule of Lorenzen hereinabove quoted, be construed as making the one so acting guilty of kidnaping only if the taking and carrying away is done for an illegal purpose or with an illegal intent. So construed the legislative purpose will be preserved and furthered, and innocent persons who cannot have been within the legislative intention in adopting section 207 will be excluded from the operation of the law. It results that the instruction above quoted upon the intent necessary to constitute the crime of kidnaping under the facts of this case was erroneous. It also appears under the facts of this case to have been prejudicial. The defendant was more or less intoxicated. He was with the child from 4 p. m. to 5 p. m., when the lady first saw them together behind the fence. At that time both appeared to her to be fully clothed. Fifteen minutes later the police found them in the compromising position which they described. It seems highly improbable, if the defendant had the violation of section 288 in mind while he was leading the child, that he would have waited an hour to accomplish that purpose. Given an instruction that the defendant's purpose or intent must have been an illegal one in taking the child to the point where they were later discovered in order to render him guilty of kidnaping, it seems reasonably probable that the jury would have found that defendant had no such illegal purpose or intent in leading the child, and only formed the intent to violate section 288 at some time between 5 p. m. when they were observed fully clothed and 5 :15 p. m. when the officers observed them partially undressed.

The judgment of violation of Penal Code, section 288, is affirmed. The judgment of kidnaping is reversed.

Gibson, C. J., Traynor, J., Peters, J., and White, J., concurred.

SCHAUER, J., Concurring and Dissenting.—I agree that the conviction of violation of section 288 of the Penal Code should be affirmed but I must dissent from the reasoning and conclusion concerning the conviction of violation of section 207.

Defendant was represented in the trial court by a deputy public defender. That officer, presumably, was of the opinion

that an appeal could not reasonably be expected to result in reversal or modification of the judgment, for he did not appeal. (See Gov. Code, § 27706.)[1] Defendant noticed his appeal in propria persona and requested the District Court of Appeal to appoint counsel for him. That court (Second Appellate District, Division One) referred the matter to the Committee on Criminal Appeals of the Los Angeles Bar Association. A member of that committee examined the record (which, since defendant had not made any request for an "additional" record, did not include the instructions; see rule 33 of the Rules on Appeal) and advised the District Court of Appeal that he found no ground for appeal. The appellate court made an independent investigation of the record, determined that "it would be neither advantageous to the defendant nor helpful to [the] court to have counsel appointed," and denied defendant's request. The latter procedure was in accord with the decision in *People* v. *Hyde* (1958), 51 Cal.2d 152, 154 [1] [331 P.2d 42].

Defendant filed with the District Court of Appeal in propria persona briefs in which he complained, among other things, that he had not received a transcript of the instructions. Because of defendant's probable unfamiliarity with legal procedure he may not have known of the requirement of rule 33(b) that he request any desired "additional" record when he filed notice of appeal, or of the requirement that in subsequently seeking augmentation of the record (rule 12(a)) he should show generally what he expected the additional record to contain and how he expected to make use of it on appeal. (See *People* v. *Parkinson* (1956), 139 Cal.App.2d 500 [293 P.2d 801].) And because of his apparently limited understanding of substantive law he probably could not have complied with the latter requirement if he had known of it.

Since the record reveals that inherently substantial factual issues as to the existence of the intent necessary to constitute the crimes charged and the effect thereon, if any, of defendant's intoxication were presented to the jury, it was important that the instructions on those subjects be correct. This was especially so because of the heinousness of defendant's conduct and the unappealing nature of the only defense colorably

---

[1]Government Code, section 27706, provides that "The public defender shall perform the following duties: (a) . . . [H]e . . . shall prosecute all appeals to a higher court or courts of any person who has been convicted, where, in his opinion, the appeal will or might reasonably be expected to result in the reversal or modification of the judgment of conviction."

available to him, i.e., claimed voluntary intoxication of an extent which would have prevented his forming the requisite intent. In the circumstances the District Court of Appeal, to make sure that defendant had been given full measure of his right to a fair and dispassionate trial, may have done as the record in the Parkinson case, *supra,* page 501 of 139 Cal. App.2d, shows that this same Division One, Second District, did there; i.e., examined the instructions in the superior court file.[2] The record here does not disclose whether the District Court of Appeal followed this course. In affirming, it stated the correct general rule that "It is the duty of appellant to bring an adequate record to this court." (*People* v. *Oliver* (1960, Cal.App.), 6 Cal.Rptr. 194, 197.)

We granted a hearing and appointed counsel for defendant. Counsel did not claim error in the instructions or seek augmentation of the record. This court of its own motion, however, ordered augmentation of the record and now bases a reversal on asserted prejudicial error in the instructions as to the intent necessary to constitute "simple kidnaping." Of course I do not suggest that an appellate court should hesitate to reverse for prejudicial error merely because it was not pointed out by counsel, but I think that the error as to the intent necessary to constitute "simple kidnaping" appears,

---

[2] I recognize that on appeal the defendant is no longer presumed to be innocent. To the contrary, his guilt has been established and every presumption is in favor of the regularity of the proceedings in the trial court. I think, too, that those able justices of the District Court of Appeal who voluntarily undertake the added burden of independently researching the record for possible flaws in the judicial process as it has been applied to indigents, are to be commended for their devotion to the public interest. This devotion is so broad in scope that these justices give the skill and acumen of their seasoned experience to protecting the rights of the indigents, and at the same time to making unnecessary the expenditure of public funds which would ensue from the appointment of counsel, in cases wherein a paid attorney could accomplish nothing which would benefit the defendant, the state or the cause of justice. Those members of the Bar who (literally as amici curiae) likewise unselfishly aid the district courts in this work, are similarly to be commended.

It bears emphasis that the duty assumed by the justices and the volunteer lawyers, is an exacting and onerous one. Under the majority decision in *People* v. *Hyde* (1958), 51 Cal.2d 152, 154 [1] [331 P.2d 42], it is, as I understand the opinion, the unspelled out but implied duty of the reviewing court (in cases wherein an indigent requests and is refused counsel) to examine the entire record (augmenting it if appropriate) to the end of reaching and manifesting a fully informed and confident conclusion that there has been neither a denial of due process nor error which is prejudicial within the compass of *People* v. *Watson* (1956), 46 Cal.2d 818, 835-836 [12] [299 P.2d 243]. Only when the record shows such exacting care is it immediately apparent to subsequently petitioned reviewing courts that the quality of justice on appeal for the indigent is of the same standard as for the opulent.

not in the instructions given by the trial judge, but only in the majority opinion of this court.

We are not confronted with a situation in which there is evidence that defendant led a child too young to be capable of consent away from danger or to its home for proper motives, and the majority's importation into its discussion of hypothetical examples of persons who do such acts for commendable purposes confuses the issue. Defendant does not suggest that in leading the baby about he had any proper purpose or even that he acted out of drunken but innocent fondness for children. His own testimony (not set out by the majority but summarized here in the footnote),[3] even viewed in a light most favorable to him, indicates that in originally taking the child about he acted at best, in the phrase of defendant's counsel accepted by the majority (*ante*, pp.771-772), "without . . . any purpose" so far as the child was concerned. The fact that the little boy was taken *without any*

---

[3] Defendant testified as follows: On the day of the crimes he was hired to distribute handbills. Between about 6 a. m. and 12:30 p. m., while he covered his route on foot, he drank two large cans of beer ("I believe they are quarts") and a bottle of "Thunderbird port." From 12:30 until 1:45 p. m. defendant rode in his employer's truck which went about picking up the handbill distributors; during this ride he drank another bottle of wine.

From 1:45 until about 3:45 he drank beer at a tavern not far from the scene of the subsequent offenses. He went to another tavern. There "I drank a few bottles of beer and I figured I was getting too drunk, and I decided I would take a walk. . . . I went out the door and I met a fellow that had a child by his hand." Defendant said that he did not know the name of this man but was casually acquainted with him; that the man "said he was baby sitting for his aunt or his sister—I don't know quite exactly which." (It is to be noted that the baby's mother testified that she let the child out to play; there is no suggestion that she entrusted him to any baby sitter.) The man told defendant that "he didn't have any money. . . . I said, 'I can buy a drink.' I figured it would be a good investment, because there may be sometimes when he would buy me a drink." Defendant purchased a fifth of Tokay.

"Then he [defendant's asserted acquaintance] wanted to drink on the street. . . . I told him I didn't want to drink there because I didn't want to go to jail." (The defendant says he was not that drunk.) Taking the child they went into a pedestrian tunnel but there were too many passers-by to permit *peaceful drinking*. The acquaintance "said he knew a better place. . . . And we went to a place—it seemed to me I was really getting pretty loaded, in other words, at the time, but it seemed to be behind some buildings, and it seemed to be kind of on a hill." (This answers the description of the vicinity in which defendant—but not his asserted acquaintance—was subsequently found *flagrante delicto* with the child and arrested.)

"The child sat down, and he [the acquaintance] sat down, and I sit next to the gentleman, and we started passing the bottle around. . . . [The] last thing I remember was drinking. The next thing I remember was waking up in the Central Jail."

*purpose* seems to me to establish that he was *not* taken for any *good* purpose. The leading or carrying away of a child of two for no good purpose appears to me to constitute precisely the crime of "simple kidnaping" which the statute—and the instructions given—defined. Surely the purpose of this statute includes the protection of small children—and their parents in safely letting their children play outdoors—against just such a taking away as that shown here. According to defendant he encountered the little boy in the company of a casual acquaintance of defendant. Defendant at this time was drunk (under the influence of alcohol) and was well aware of his condition. He went with his acquaintance (assuming there was such a person), still accompanied by the infant, with the purpose of drinking more. He did continue drinking and, he claims, he remembered nothing of the events described by the prosecution witnesses.

In appraising this claim we must remember that the jury, properly instructed on the subject, impliedly found that at about 5:15 p. m. defendant was not so intoxicated as to be unable to form the specific intent required to support a conviction of violation of section 288 of the Penal Code. (Majority opinion, *ante*, p. 764.) The majority do not suggest, and I cannot conceive, that on the record in this case and in view of the just mentioned implied finding, the jury, had they been differently instructed, might have further found that at about 4 p.m., when defendant (not accompanied by his "casual acquaintance") was seen leading the child down an alley, he was so intoxicated that he did not have the intent to lead the boy.

Even if the jury did find that defendant had not yet formed the intent to violate section 288 at the time he led the child down the alley (see majority opinion, *ante*, p. 768), in my opinion they properly convicted him of kidnaping under instructions which adequately covered any reasonable interpretation of the evidence. I think that a defendant who knowingly takes a child, too young to consent to this guidance of his direction, from the place where defendant found him, *for a purpose unknown to defendant* (certainly such a taking is *not* to benefit the child), is guilty of kidnaping[4] as correctly defined in the instructions given (quoted in the majority

---

[4]Section 207 of the Penal Code provides in material part that "Every person who forcibly . . . takes . . . any person in this state, and carries him . . . into another part of the same county . . . is guilty of kidnaping."

opinion, *ante*, p. 764). The gravamen of the offense is that defendant intentionally and "forcibly" (because of the child's youth merely leading him by the hand was force) took the boy on a route which the child did not wish to follow and which was not for any reason, either real or apparent, for the benefit of the child (because of his tender years he was incapable of consenting to go with defendant).

Under the circumstances shown in evidence the jury were correctly instructed that "any specific intent or purpose, as distinguished from ordinary criminal intent," was not an essential element of the kidnaping. Penal Code, section 22, provides that "whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act," but it also specifies that "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition." The jurors here were told that "The intent to do the forbidden thing constitutes the criminal intent." The "forbidden thing" was the removal of the child against his will for *no proper purpose*; defendant had that intent, and a nefarious purpose apart from the simple intention to take the child was not required. By the very language of section 22 the simple kidnaping of this little boy was no less criminal by reason of defendant's intoxication.

In some of the hypothetical cases suggested by the majority it might be proper to give instructions which point out that removal of a person against his will for a proper purpose is not kidnaping, but this case is not a suitable vehicle for developing the law in that regard.

I am impelled to conclude that this is a case which should not, and would not normally, result in a reversal of the judgment on either the 288 or the kidnaping count. I do not wish to discuss the psychology of justice but in analyzing a declared conclusion which is not substantially supported by the arguments or facts recited, the potentialities of some unrecognized influence on the decisional process cannot be ignored. In this connection the strongly asserted convictions of some of the justices as shown in the following quotations may be relevant:

1. From *People* v. *Hyde* (1958), *supra*, 51 Cal.2d 152, 153-154 [331 P.2d 42]: "The public defender represented defend-

ant at the trial but did not undertake the prosecution of his appeal. (See Gov. Code, § 27706.) Defendant requested the District Court of Appeal, Second District, Division Three, in which the appeal was pending, to appoint an attorney to represent him, claiming that he was without funds to employ counsel. That court referred the request to the Los Angeles Bar Association Committee on Criminal Appeals, which in turn referred the matter to one of its attorney members. This attorney made a written report to the court setting forth that he had examined the record and that in his opinion it disclosed no meritorious ground of appeal. The court so advised the defendant and extended his time to file a brief. Defendant prepared and filed a brief in propria persona. The District Court of Appeal made an independent examination of the record and affirmed the judgment. [Citation.]

"The [supreme] court ordered a hearing on its own motion in this case to consider the question of the appointment of counsel on appeal for an indigent defendant who has been convicted of a crime.

"It is our opinion that appellate courts, upon application of an indigent defendant who has been convicted of a crime, should either (1) appoint an attorney to represent him on appeal or (2) make an independent investigation of the record and determine whether it would be of advantage to the defendant or helpful to the appellate court to have counsel appointed. This investigation should be made solely by the justices of the appellate courts. After such investigation, appellate courts should appoint counsel if in their opinion it would be helpful to the defendant or the court, and should deny the appointment of counsel only if in their judgment such appointment would be of no value to either the defendant or the court."

2. The above quoted holding apparently settled the law governing the practice by the District Court of Appeal insofar as any aspect of that practice could conceivably constitute a procedure subject to the jurisdiction of this court. However, only a little more than two years later, in *People* v. *Brown* (1960), *ante*, pp. 64, 69-70 [9 Cal.Rptr. 836, 357 P.2d 1072], it appears that three justices of this court joined in the following concurring opinion: "I concur in the judgment. It is my opinion, however, that the holding in *People* v. *Hyde* . . . should be expanded to require the appointment of counsel on appeal for all indigent defendants convicted of felonies.

"The question calls for resolution even though we appointed

counsel to represent defendant in this court. The question cannot remain in abeyance. This very case illustrates the recurring practice of the District Court of Appeal, Second District, Division Three [the case now at bench comes from Division One], of referring the question of the appointment of counsel to the local bar association committee [citation] and the consequent countervailing practice of this court to then grant a hearing, even on its own motion, whenever there has been no appointment of counsel. There would be no end to such wasteful procedure were the question deemed moot each time this court granted a hearing and appointed counsel. The question should be settled in the interest of effective appellate court administration."

3. See also the second concurring opinion in the Brown case, beginning on page 75, *ante*; the dissent in *People* v. *Gullick* (1961), *ante*, p. 544 [11 Cal.Rptr. 566, 360 P.2d 62]; and *People* v. *Vigil* (1961), 189 Cal.App.2d —— [11 Cal. Rptr. 319].

If there is a "countervailing practice of this court to . . . grant a hearing, even on its own motion, whenever there has been no appointment of counsel" in the District Court of Appeal, then indeed there should be an end to *such* "wasteful procedure"; and in no event should the disposition of a cause here *on the merits* be affected by disaffection of any justice for the *intra curiam* procedures, as such, of the appellate courts. We are, of course, concerned that there be no denial of due process or of equal protection of the law, and that no remediable miscarriage of justice be countenanced. But our interest is in the cause on *its* merits; and the mere fact that the appellate court did not appoint and pay counsel to prosecute an appeal for an indigent who has been accorded every legal right that the record supports, should not actuate a transfer to this court, much less, reversal of a judgment.

For the reasons above stated, I would affirm both judgments.

McComb, J., concurred.