Filed 2/26/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DWAIN EVERETT DAVIS,<br><br>        Defendant and Appellant. | A139111<br><br>(San Mateo County<br>Super. Ct. No. SC43066A) |

In 2012 the voters adopted Proposition 36, the Three Strikes Reform Act, for the purpose of "restor[ing] the original intent of California's Three Strikes law," namely, "imposing life sentences for dangerous criminals" whose most recent offense is classified as either a dangerous or a serious felony. (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) text of proposed law, § 1, p. 105.) The benefits of the measure, in the form of a reduced sentence, can be denied to an otherwise eligible inmate if the court determines that such lenience "would pose an unreasonable risk of danger to public safety." (Pen. Code, § 1170.126, subd. (f).)[1] We hold that when a trial court declines on this basis to grant an inmate's petition for resentencing, that decision should be upheld on appeal unless the reviewing court is able to conclude that the decision qualifies as an abuse of the considerable discretion granted by the Three Strikes Reform Act.

Here, the trial court declined to reduce the 25 years to life sentence of defendant Dwain Everett Davis, concluding that his release after resentencing would pose an unreasonable risk of danger to public safety. The cited reasons were defendant's continued refusal to acknowledge possessing the firearm, his not so latent hostility, and

---

[1] Statutory references are to the Penal Code.

his inadequate plans if released.  We conclude that this decision was well within the court's discretion**.**

During the pendency of this appeal, the voters enacted Proposition 47, the Safe Neighborhoods and School Act, which established a procedure whereby specified classes of felons can petition to have their felony convictions reduced to misdemeanors and be resentenced accordingly.  Proposition 47 contains a vastly more restrictive definition of "unreasonable risk of danger to public safety" than the one used in Proposition 36 for "Three Strike" felons.  We conclude that the Proposition 47 definition was not intended by the voters to displace the broader definition of the Three Strikes Reform Act already in use.

In light of these conclusions, we affirm the trial court's order denying defendant's petition for resentencing.

## BACKGROUND

On December 11, 1998, a San Mateo jury found defendant guilty as charged of being a past-convicted felon in possession of a firearm, itself a felony under former section 12021, subdivision (a)(1).[2]  The trial court (Hon. Barbara J. Mallach) then found true enhancement allegations that defendant had 1991 and 1995 convictions for armed robbery.  After denying defendant's motion to strike one of these priors, Judge Mallach sentenced him to state prison for a Three Strikes law term of 25 years to life.  This court affirmed the judgment.  (*People v. Davis* (July 7, 2000, A086052) [nonpub. opn.].)

At the 2012 General Election, the voters adopted the Three Strikes Reform Act as an initiative measure, thereby amending the two Three Strike statutes (§§ 667, 1170.12) to authorize 25 year to life terms only where the "third strike" conviction is a serious or violent felony.  The initiative also added section 1170.126, which establishes the procedure for persons already sentenced under the Three Strikes law to apply for a

---

[2] Effective January 1, 2012, this provision was repealed and reenacted without substantive change as section 29800, subdivision (a).  (See Cal. Law Revision Com. com. & Historical and Statutory Notes, 51D Pt. 4 West's Ann. Pen.Code (2012 ed.) foll. § 29800, p. 194.)

reduction of a 25 year to life term. The inmate must first "file a petition for a recall of sentence, . . . to request resentencing." (§ 1170.126, subd. (b).) Subdivision (e) of section 1170.126 establishes the criteria to determine whether "[a]n inmate is eligible for resentencing." "Upon receiving a petition for recall of sentence under this section, the court shall determine whether the petitioner satisfies the criteria in subdivision (e). If the petitioner satisfies the criteria in subdivision (e), the petitioner shall be resentenced [as a second strike offender with a doubled term] pursuant to paragraph (1) of subdivision (e) of Section 667 and paragraph (1) of subdivision (c) of Section 1170.12 unless the court, *in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety*."[3] (*Id.*, subd. (f), italics added.)

The language we have italicized was deemed sufficiently important that it was reiterated: "In exercising its discretion under subdivision (f), the court may consider: [¶] . . . [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g)(3).[4])

"There are . . . three determinations at issue under Penal Code section 1170.126, subdivision (f): first, the court must determine whether the prisoner is eligible for resentencing; second, the court must determine whether resentencing would pose an unreasonable risk of danger to public safety; and third, if the prisoner is eligible and resentencing would *not* pose an unreasonable risk of danger, the court must actually resentence the prisoner." (*People v. Superior Court* (*Kaulick*) (2013) 215 Cal.App.4th

---

[3] There is a clear expectation that the petition will be heard by the court which sentenced the inmate, which is what occurred here when defendant's petition was decided by Judge Mallach. However, "[i]f the court that originally sentenced the defendant is not available . . . , the presiding judge shall designate another judge to rule on the defendant's petition." (§ 1170.126, subd. (j).)

[4] The two other categories of information the court *may* consider are "The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes," and "The petitioner's disciplinary record and record of rehabilitation while incarcerated." (§ 1170.126, subd. (g)(1) & (2).)

3

1279, 1299 (*Kaulick*).)  If the petitioner is found eligible, it is the prosecution's burden to prove, by a preponderance of the evidence, that reducing the petitioner's 25 to life sentence would pose "an unreasonable risk of danger to public safety."  (§ 1170.126, subds. (f), (g)(3); *Kaulick*, *supra*, at p. 1305; accord, *People v. Flores* (2014) 227 Cal.App.4th 1070, 1075-1076.)

Barely two months after the Three Strikes Reform Act was adopted, on January 25, 2013, defendant filed a "Motion for Recalling of Sentence and Notice of Motion to Declare Offense to Be a Simple Felony (Per . . . section 1170.126)," set for hearing before Judge Mallach.  There, over the prosecution's vigorous objection, Judge Mallach first ruled that defendant was eligible for resentencing.[5]  Judge Mallach then heard two days of testimony from defendant and defendant's brother on the issue of

---

[5] The Attorney General has elected to challenge that determination.  A conviction for violating former section 12021 is not one of the offenses "defined as serious and/or violent felonies by subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7" (§ 1170.126, subds. (b), (c)(1)) that make an inmate ineligible for relief under the Act. We note that defendant's conviction did not have an enhancement that he was armed with the gun he illegally possessed, which would make him ineligible.  (§§ 1170.126, subd. (e)(2), 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii).)  A number of decisions hold that "where there are facts in the record of conviction that show an inmate was 'armed with a firearm'—had the firearm available for immediate use—during the commission of his or her current offense, the inmate is disqualified from resentencing under the Act even though he or she was convicted of possessing the firearm, and not of being armed with it . . . ."  (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1026-1027; see *People v. Quinones* (2014) 228 Cal.App.4th 1040, 1042; *People v. Elder* (2014) 227 Cal.App.4th 1308; *People v. White* (2014) 223 Cal.App.4th 512, 519.)

In an obvious attempt to bring defendant within this rule, the Attorney General asks us to take judicial notice of the entire record on the previous appeal.  With the exception of our prior opinion, which Judge Mallach did consult, we deny this request because that record was not before her.  (See fn. 6 and accompanying text, *post*.) (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2 [" 'Reviewing courts generally do not take judicial notice of evidence not presented to the trial court' absent unusual circumstances."].)  And we express no opinion on the question of whether defendant was in fact ineligible, because we prefer to address the ground to which so much effort was devoted, the ground on which relief was actually denied by Judge Mallach.

4

whether defendant's resentencing and release would entail an "unreasonable risk of danger to public safety" within the meaning of the Three Strikes Reform Act.

Michael Wilson, defendant's older brother, testified that he lives in a four-bedroom house in San Mateo and is employed as a truck driver. If defendant were released, "I would be able to house him and . . . I plan on trying to make him a Teamster and getting him in a truck." Wilson acknowledged on cross-examination that he had not visited defendant in prison for 16-17 years, and seldom writes, but has had "periodic" telephone conversations. Only one other family member, Wilson's daughter, lives in the area. Wilson admitted having a felony conviction ("back in the '80s, for drug sales or . . . conspiracy") for which he had served time in state prison, being released in 1990. As for defendant's robberies, Wilson dismissed them because "he was young . . . and he wasn't really thinking properly." And as for defendant's latest conviction, defendant told Wilson that it was the man arrested with defendant who actually had the gun, but the other man and the police framed defendant.

Defendant testified that after years in prison, he "matured late," "I was able to accept what I had done and leave it behind." He is "very remorseful" and "very apologetic" for the "all the turmoil I put everybody else through." Defendant obtained his GED in prison, received 20 "academic achievement . . . certificates," and has resisted joining a gang. It had been five years since his last disciplinary action, in 2008, for complicity in smuggling marijuana into the prison, and for which he was convicted and received a four-year consecutive sentence. Defendant testified that his involvement was coerced out of fear of being attacked by a gang, which demanded his participation as the price for not letting it become known that defendant had a "sex offense" in his juvenile history. With this one exception, defendant testified he has been discipline-free since 2005.

Defendant's other disciplinary incidents were for "disrespectful conduct" in 2005; "mutual combat with another inmate" in 2003; "behavior which could lead to violence" in 2002; "failure to stand for mandatory [head] count," "disrupting class and not following instructor directions," and "disruptive behavior," all in 2001  One of the 2001

5

incidents occurred when defendant was bored in class and told the instructor : "This is a sorry ass fucking class. I want out of here. No one better put their hands on me." That same year defendant called another instructor "a mother fucking peckerwood," which "got [him] kicked out the small engine repair class." Defendant thought the class was "a waste of time."

Defendant testified on cross-examination that the gun conviction came through his involvement with a man named Kenney. "Kenney was the one who had the gun," but "they arrested me for the gun." The officer who testified at the trial that he saw defendant throw the gun away was lying. Defendant admitted that he and Kenney were planning to rob the participants at a drug sale. Defendant also admitted he was carrying a mask for the robbery.

Judge Mallach had before her numerous exhibits submitted by the prosecution regarding "the question of unreasonable risk" if defendant were released after resentencing.[6] The hearing was continued so that defendant's prison records (including his medical records) could be obtained and considered.

When the hearing resumed, the prosecution submitted additional exhibits impeaching the testimony of defendant's brother with records showing that he in fact had four felony convictions, and had twice served time in state prison.[7] The prosecutor

---

[6] The actual exhibits were not included in the record on appeal and neither party has augmented the record with the exhibits. However, the record does have an "Outline of Prosecution Exhibits" that appears to be essentially an index of the contents of the "binder with five primary sections" submitted by the prosecution.

[7] Judge Mallach also considered a letter from defendant, in which, after stating "On 5/31/13, I took the stand in your courtroom, under oath, telling the truth as best I remembered it," defendant augmented his testimony with the claim that he had been a long-term victim of physical abuse by his stepfather. After promising that if granted "the mercy of the court . . . I will not disappoint your trust in me," defendant stated that his is "the first [resentencing] case back to San Mateo County." The accuracy of the latter statement cannot be confirmed from the record, but there are suggestions that both the San Mateo Superior Court and the San Mateo District Attorney were getting ready for a number of resentencing petitions. The deputy who opposed defendant's petition was described by defendant's counsel as "handling all of these cases for the DA's office."

further advised Judge Mallach that the brother was facing trial on a felony assault charge ("section 245(a)(4), use of force likely to cause great bodily injury") together with "a separate count of battery." The prosecutor believed that these charges, plus the fact that the brother was on bail, "are matters which the Court should weigh [in determining] the credibility of Mike Wilson's statements, specifically as to his plan to set his brother on the right road."

Defendant testified briefly about the claim of paternal abuse broached in his letter to Judge Mallach (see fn. 7, *ante*) and an event that recently occurred in prison, when defendant had helped prevent another prisoner from committing suicide. Defendant also testified as to his brother's deteriorating health and how, if released, he (defendant) would stand by him and assist in his hour of need, even to the point of a possible organ donation.

Wilson retook the stand and told the court that he is suffering from kidney failure, requiring dialysis three times a week. He is on the list for a new kidney. He conceded that his criminal history was more extensive than he previously testified ("I don't recollect four of them"), and that he was indeed facing trial on a new charge. Wilson testified further that his home is rented, not owned; that he is no longer able to work and has not worked for nine months. After exhausting his unemployment payments, he has been receiving state disability and food stamps. The bills are "stacking up," and "the load is on" his wife. Her income is "sufficient to meet . . . rent and food, utilities."[8]

When the prosecutor asked "How would your brother being in your home change the way you're managing now? Do you foresee that there would be some difficulty in meeting his needs on top of your family's needs?", Wilson replied:

---

Plus, there are also several references to the deputy and Judge Mallach separately attending a seminar on resentencing held at Stanford Law School, presumably one conducted by the school's Three Strikes Project. (See *People v. White*, *supra*, 223 Cal.App.4th 512, 516 [showing "Stanford Three Strikes Project as Amicus Curiae" on behalf a defendant denied resentencing].)

[8] However, near the end of his testimony, Wilson described himself as "broke."

"A. No, I don't see. He's a grown man. I'm pretty sure Dwain can take care of himself pretty much.

"Q. So you figure he'll get a job?

"A. Yeah, I know he will.

"Q. You've explained to us last time that being a felon it was hard for you to get a job, true?

"A. No.

"Q. No?

"A. It was not hard for me to get a job when I first got out. I went to school. I went to summer school. Started taking class. And right after that I was in work, by the end of that year I was at work in work."

Concerning their stepfather's abuse, Wilson testified that it made defendant violent and possibly defendant "is currently suffering some mental disability as the result." Wilson admitted he still carries "some of that rage," and "I fought this for a lot of years."

The prosecutor stated the argument against resentencing: Defendant had "a very substantial juvenile history," and "four prior felony convictions prior to the present crime. 1987, possession for sale of cocaine . . . . 1988, sale of cocaine . . . . There's a misdemeanor battery on a police officer in 1991. Felony robbery, use of a gun in 1991 in Pinole. And then in Redwood City the robbery of . . . . 1995," only six weeks after being paroled. The violation of former section 12021 in April 1997 was after being paroled for the 1995 robbery. Defendant had "seven serious . . . violations in the Department of Corrections." As for defendant's brother: "He admits now that he has four felony convictions, [has] been to prison twice, and has a pending charge of felony 245(a)(4). . . . He says he's on disability right now . . . . He's on a waiting list for a kidney. [¶] . . . .[¶] . . . In fact, he's saying he hasn't even gotten any disability checks [for two months]." "[Defendant's] conduct is predictable. He has some aggression in his belly

8

that he cannot control. The next crime will be with a gun and a ski mask[9] and it will be a robbery. His behavior is predictable."

Defense counsel argued that "there have been incidents" in prison, but "nothing major," and "nothing in the past five years, and I take that to believe that he's finally adjusted sort of to life and he's finally reached a point where he's growing up." "I don't think there is anything in the past 16 years that suggests to the Court that he would be unreasonably dangerous to the public were he released and I would ask the Court to resentence him and release him."

Judge Mallach ruled as follows:

"As we all know, the best predictor of the future is the past. So you look to some extent to the past. . . . [¶] . . . [O]ne of the facts I'm struck by is that in the letter to the Court that the defendant wrote on June 3rd [see fn. 7, *ante*] he says . . . that on May 31, 2013, I took the stand in your courtroom under oath, telling the truth as best as I remembered. . . . [¶] But, . . . as Ms. Allhiser [the prosecutor] points out, clearly that isn't the case, and that's what bothers me. I expected . . . that after this amount of time that . . . Mr. Davis would be more candid in his testimony and would finally testify truthfully that the gun was his. I mean it's so clear that it was. . . . I was rather taken aback by that. Ms. Allhiser, in her comments . . . actually said she was surprised that he had squandered his opportunity. And I think that was my feeling as well. I was rather stunned about that."

". . . [Both defendant and his brother] have this rage, whether it's attributable to the stepfather, I don't know, but they certainly have this rage for whatever reason. It's come out much more so with Mr. Davis . . . [¶] . . . And I also found his testimony. . . to be not totally candid. You know, to say that somebody with a felony conviction is going to have an easy time getting a job is just not true. I for a long time was involved with our drug abuse, drug addiction programs . . . and . . . each and every time the defendant [who] had successfully completed the program was trying to get a job, and each and every time

---

[9] A feature of defendant's first robbery and the gun possession conviction.

9

if they had a felony conviction that stopped them from getting a good job until the felony was reduced, if it could be, to a misdemeanor.

"So it's just not true that you can get a good job if you have felony convictions. So I have to factor that into the equation of, you know, what are the defendant's chances if he's out, living with his brother who has obviously serious medical issues, who has economic issues, who then would have an issue of trying to shepherd his brother who I don't think would have an easy time . . . . [¶] . . . [¶]

". . . So, . . . I guess the question is what's an unreasonable risk of danger to the public? That's the question. But I just think the fact that the defendant is still not able to be truthful which, again, is just mind-boggling to me and all of the other circumstances that I've talked about . . . the aggression that Ms. Allhiser points out from the records in the prison. The fact that the reentry plan is . . . not in my view a successful one. [¶] . . [¶]

"So the Court does believe based on all of the circumstances that the defendant does pose an unreasonable risk of danger to the public if he were to be resentenced as a second strike offender, so the defendant's petition for resentencing is denied."

Defendant perfected this timely appeal from the appealable order denying his petition. (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 597.)

## REVIEW

## Standard Of Review

The foundation for defendant's efforts to overturn Judge Mallach's decision is the "unreasonable risk of danger to public safety" language in section 1170.126. From this, defendant continues that this language "has not yet been construed by our Supreme Court, but it probably means the same thing as the similar concept in Penal Code section 3041, which provides, with respect to the finding of suitability for parole of prisoners sentenced to life." Such a finding, whether made by Board of Parole Hearings or the Governor, must be upheld by the courts if "there exists 'some evidence' demonstrating that an inmate poses a current threat to public safety." (*In re Shaputis* (2011) 53 Cal.4th 192, 209.) Citing *Kaulick*, *supra*, 215 Cal.App.4th 1279, the Attorney

General agrees:  "A trial court's decision to refuse to resentence a prisoner, based on a finding of dangerousness, need only be supported by some evidence."  We agree with the parties' approach, but only in part.

We agree that parole determinations made pursuant to section 3041 are a natural source of guidance.  The statute directs that the Board of Parole Hearings "shall set a release date" for the prisoner unless "consideration of the public safety" outweighs the presumption favoring release.  (§ 3041, subd. (b).)  This language has been construed as meaning "a life prisoner shall be . . . denied parole if . . . the prisoner will pose an unreasonable risk of danger to society if released from prison."  (Cal. Code. Regs., tit. 15, § 2402, subd. (a); accord, e.g., *In re Prather* (2010) 50 Cal.4th 238, 249-250; *In re Lawrence* (2008) 44 Cal.4th 1181, 1201-1202.)  And in grappling with that issue over the past 13 years, the courts have developed a substantial body of decisional law construing the "suitability" and "unsuitability" factors enumerated in an administrative regulation.  (Cal. Code. Regs., tit. 15, § 2402, subds. (c), (d).)

Although there no direct proof that the voters intended, with the "unreasonable risk of danger to public safety" language, to incorporate the principles of parole release and transfer them to section 1170.126, the principles, the similarity of wording, and the underlying concern makes the genealogy of the initiative fairly clear.  Moreover, there is no other apparent analogue in the Penal Code.  Thus, we agree that in construing the Three Strikes Reform Act, the obvious place to look for guidance is parole release decisions (which was clearly the approach adopted by Judge Mallach).

But this does not mean that every point of parole release law should be adopted without thinking.  The "some evidence" standard shows why uncritical acceptance is inappropriate.

" 'In every appeal [or writ proceeding], the threshold matter to be determined is the proper standard of review—the prism through which we view the issues presented to us.' "  (*People v. Lindberg* (2008) 45 Cal.4th 1, 36, fn. 12.)  "However convoluted the facts, or complex the issues, the standard of review is the compass that guides the

appellate court to its decision. It defines and limits the course the court follows in arriving at its destination." (*People v. Jackson* (2005) 128 Cal.App.4th 1009, 1018.)

Generally, three standards are employed, each powered by a different degree of deference to the reasoning and ruling of the trial court.

De novo, or independent, review pays no deference to the trial court's view in examining pure issues of law, such as a trial court's conclusions of law, or statutory meaning, or the scope of a statute's operation. (*In re Charlisse C*. (2008) 45 Cal.4th 145, 159; *Franchise Tax Board v. Superior Court* (2013) 221 Cal.App.4th 647, 659; *Andreini & Co. v. MacCorkle Ins. Service, Inc*. (2013) 219 Cal.App.4th 1396, 1405-1406; *Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270, 1276; *Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1174.)

The abuse of discretion standard professes to accord considerable deference to a lower court's decision, particularly when factual or credibility determinations are involved. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712 ["The trial court's . . . application of the law to the facts is reversible only if arbitrary and capricious"]; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1053; *People v. Carson* (2005) 35 Cal.4th 1, 12; *People v. Nance* (1991) 1 Cal.App.4th 1453, 1460, fn. 4; cf. *In re Charlisse C*., *supra*, 45 Cal.4th 145, 159 ["a disposition that rests on an error of law constitutes an abuse of discretion"].) Indeed, "[o]ur high court has indicated that this . . . standard is founded on principles of deference to the trial court, such as 'whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered' [citation]; and that appellate courts should disturb discretionary trial court rulings only upon a showing of ' " 'a clear case of abuse' " ' and ' " 'a miscarriage of justice.' " ' [Citation.]" (*St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 772-773.) And "the deference it calls for varies according to the aspect of a trial court's ruling under review" (*Haraguchi v. Superior Court*, *supra*, at p. 711) because that ruling almost always has the factual component of the setting in which discretion is exercised. (*People v. Carmony* (2004) 33 Cal.4th 367, 375 [" 'all discretionary authority is contextual' "]; *People v. Jacobs* (2007) 156 Cal.App.4th 728, 737.) Unless the facts of

that setting are undisputed, there will be a measure of deference to " 'the trial court's resolution of credibility and conflicting . . . evidence.' " (*Quackenbush v. Mission Ins. Co.* (1996) 46 Cal.App.4th 458, 466; see *People v. Ochoa* (1998) 19 Cal.4th 353, 408; *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479 ["an appellate court should defer to the factual determinations made by the trial court when the evidence is in conflict"].) That measure of deference, however modest, is lacking with de novo review.

The third, and most commonly used, is the sufficiency of evidence standard. The record is examined through the eyes of the trial court, most favorably to the trial court's decision, with the presumptive goal of upholding whatever factual determinations the particular trial court was required to make. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; *People v. Moon* (2005) 37 Cal.4th 1, 22; *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 31.) Everything that can be presumed will be presumed in favor of the trial court's decision (*People v. Giordano* (2007) 42 Cal.4th 644, 666), and all points on which reasonable persons could differ are resolved in the trial court's favor. (*People v. Alexander* (2010) 49 Cal.4th 846, 883; *Thompson v. City of Long Beach* (1953) 41 Cal.2d 235, 246.)

The "some evidence" standard has very different nonjudicial antecedents. It first appeared in the context of the administrative discipline process inside prisons (*Superintendent v. Hill* (1985) 472 U.S. 445, 454-456; *In re Wilson* (1988) 202 Cal.App.3d 661, 666-667), but soon became established in the burgeoning field of fixing a release date for inmates seeking parole. (See *In re Rosenkrantz* (2002) 29 Cal.4th 616, 658; *In re Powell* (1988) 45 Cal.3d 894, 904.) The "some evidence" standard is entirely a function of the separation of powers. A court examining the internal operation of a prison or a denial of parole is not reviewing the decision of a lower court, but the decision of the Executive Branch, and a proper respect for a co-equal branch mandates an especially deferential standard of review. (See, e.g., *In re Shaputis*, *supra*, 53 Cal.4th 192, 198-199, 215, 221; *In re Shaputis* (2008) 44 Cal.4th 1241, 1260-1261; *In re Rosenkrantz, supra*, 29 Cal.4th 616, 665-667.)

"It is settled that under the 'some evidence' standard, '[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the Governor. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor. . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision.' [Citations.]" (*In re Shaputis*, *supra*, 53 Cal.4th 192, 210.) The approach parallels that of the substantial evidence standard—"a court must consider the whole record in the light most favorable to the determination" of the parole authority. (*Id.* at p. 214.)

The bottom line is that "the ' "some evidence" standard is extremely deferential' " and "review under the 'some evidence' standard is *more deferential* than substantial evidence review, and may be satisfied by a lesser evidentiary showing." (*In re Shaputis*, *supra*, 53 Cal.4th 192, 214, 210.) How much lesser? "Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the 'some evidence' standard." (*Id.* at p. 214; accord, *In re Zepeda* (2006) 141 Cal.App.4th 1493, 1498 ["some evidence" is " '*any evidence in the record* that could support the conclusion reached' "], 1499 [quantum of evidence needed to satisfy "some evidence" test may be "meager"]; see *In re Powell*, *supra*, 45 Cal.3d 894, 904 [some evidence test satisfied if parole authority did not act " 'without information, fraudulently, or on mere personal caprice' "].) This is why we recently characterized the some evidence standard as "ultra-lenient." (*In re Morganti* (2012) 204 Cal.App.4th 904, 907.)

But decisions made under section 1170.126 are judicial, as is the review of those decisions. No separation of powers consideration is present, and thus the "some evidence" standard is not appropriate. Instead, review is to be conducted according to the

familiar abuse of discretion standard.  The three references in subdivisions (f) and (g) to the discretion of the court considering a petition for recall of a Three Strike sentence pursuant to section 1170.126 does not permit room for disagreement.

The Attorney General's reading of *Kaulick*, *supra*, 215 Cal.App.4th 1279, as endorsing the "some evidence" standard differs from our understanding.  *Kaulick* was only the second published decision to consider the Three Strikes Reform Act.  Justice Croskey penned a lengthy opinion that another Court of Appeal admired as "well written, correct, and [which] could serve as a model for opinion writing." (*People v. Flores*, *supra*, 227 Cal.App.4th 1070, 1076.)  At the end of his opinion, Justice Croskey explained why defendant Kaulick was not denied equal protection by the Three Strikes Reform Act, and in so doing dropped a footnote which reads:

"A trial court's decision to refuse to resentence a prisoner, based on a finding of dangerousness, is somewhat akin to a decision denying an inmate parole.  Such a decision need only be supported by 'some evidence.' (*In re Stevenson* (2013) 213 Cal.App.4th 841, 866 & fn. 8.)  In such a case, the inmate is not resentenced to the remainder of his indeterminate term based on a decision supported only by 'some evidence'; the inmate's sentence is supported by his conviction.  Similarly, Penal Code section 1170, subdivision (e) provides that the Board of Parole Hearings may recommend that a prisoner's sentence be recalled if the prisoner is terminally ill or medically incapacitated, and the 'conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety.' (Pen. Code, § 1170, subd. (e)(2)(B).)  Although the statutory language states that the Board of Parole Hearings 'may' recommend recall of sentence if the conditions are met, it has been interpreted to mean the Board 'must' recommend recall if the conditions are met.  (*Martinez v. Board of Parole Hearings* (2010) 183 Cal.App.4th 578, 582.)  However, a Board's decision that an inmate is ineligible for release because the conditions of release would pose a threat to public safety must be supported only by 'some evidence.' (*Id.* at pp. 582–583.)  This does not mean that an inmate is otherwise eligible for release but that release can be denied on a finding supported only by 'some evidence.'  It simply means that the inmate remains

15

subject to his initial sentence unless certain findings are made; these findings need not be established beyond a reasonable doubt." (*Kaulick*, *supra*, 215 Cal.App.4th 1279, 1306, fn. 29.)

We have no disagreement with the comment that a decision refusing to reduce a sentence under section 1170.126 "is somewhat akin to a decision denying an inmate parole." But the next sentence—"Such a decision need only be supported by 'some evidence' "—is clearly meant to apply to parole decisions. A fair reading of the entire footnote leaves no doubt on the point.

In light of the foregoing, and being in general agreement with *People v. Aparicio* (2015) 232 Cal.App.4th 1065, 1071-1075, we conclude that when a court denies relief under section 1170.126 because the court concludes that reducing the petitioner's Three Strike sentence entails "an unreasonable risk of danger to public safety," that decision involves an exercise of the court's discretion granted it by the Three Strikes Reform Act. Thus, our review is not under the "some evidence" standard, but rather whether Judge Mallach abused her discretion.

**There Was No Abuse Of Discretion**

According to defendant, none of the reasons articulated by Judge Mallach constitutes "a good and sufficient reason" for denying his petition. Defendant is mistaken.

The parties are agreed that Judge Mallach cited four reasons for concluding a resentenced and released defendant would present "an unreasonable risk of danger to public safety": (1) his lack of candor; (2) his rage; (3) his inadequate reentry plan; and (4) the nature of his last conviction. It is patent that in doing so, Judge Mallach was mindful of a number of the factors showing "suitability" for parole release. This was proper, for it is completely unrealistic to expect every court confronting a petition for relief to reinvent the wheel. So, when Judge Mallach cited defendant's inability to be candid and truthful about the former 12021 conviction, she was in all likelihood thinking of this suitability factor: "The prisoner has performed acts which tend to indicate the presence of remorse, such as . . . indicating that he understands the nature and magnitude

16

of the offense." (Cal. Code. Regs., tit. 15, § 2402, subd. (d)(3).) And when Judge Mallach concluded that defendant's "reentry plan" was not likely to be successful, she was almost certainly tracking another suitability factor, namely whether "The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." (*Id.*, subd. (d)(8).) However, none of the parole release "suitability" or "unsuitability" factors specifically addresses the second and fourth grounds, i.e., Judge Mallach's reference to "this rage" defendant shares with his brother, but which has "come out much more so" in defendant's case and appears allied with defendant's "aggression . . . in . . . prison," or Judge Mallach's belief that defendant's last offense was a gun possession conviction, but only because police intervention had prevented it from becoming the armed robbery defendant planned.

Viewing the stated reasons in their totality demonstrates that the denial of defendant's petition was no abuse of discretion.

Clearly Judge Mallach believed that "the best predictor of the future is the past," and thus but for the "proactive" policing in 1997 defendant would have had his third robbery conviction. For whatever reason, defendant has displayed a vile and sometimes ungovernable temper that is allied to criminal and anti-social impulses. There is no indication that Judge Mallach disagreed with the prosecutor's assessment that defendant "has some aggression in his belly that he cannot control"[10] and that "his behavior is predictable." Those criminal impulses have of late usually involved a gun—with its

---

[10] There is a matter we mention to illustrate the difficulty a cold record may sometimes present. As previously mentioned, both defendant and his brother testified before Judge Mallach in connection with defendant's petition, and Judge Mallach also knew of defendant from the trial on the former section 12021 charge. The passages from the hearing show Judge Mallach and the prosecutor speaking of defendant's (and his brother's) "rage" in the present tense, which might suggest that something in defendant's demeanor at the hearing was the basis for use of this characterization. On the other hand, one would think that a perceived *current* inability to control one's temper would be virtually guaranteed to receive more prominent comment, or find some mention in defendant's prison medical records that were reviewed by Judge Mallach. This is precisely the sort of atmospheric nuance that may be lost to a reviewing court reading a lifeless transcript at the remove of some time.

17

potential for violence—or actual violence (i.e., the "misdemeanor battery on a police officer in 1991"). Defendant is unable to admit the full extent of his criminal history. His long-standing unwillingness or inability to admit possession of the firearm is what so surprised the prosecutor—and "stunned" Judge Mallach.[11] As the Attorney General points out, our Supreme Court accepts this as a basis for denying parole:

"Consideration of an inmate's degree of insight is well within the scope of the parole regulations. The regulations do not use the term 'insight, but they direct the Board to consider the inmate's 'past and present attitude toward the crime' [citation] and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense' [citation]. These factors fit comfortably within the descriptive category of "insight."

"In *Lawrence,* we observed that 'changes in a prisoner's maturity, understanding, and mental state' are 'highly probative . . . of current dangerousness.' (*Lawrence, supra,* 44 Cal.4th at p. 1220.) In *Shaputis I,* we held that this petitioner's failure to 'gain insight or understanding into either his violent conduct or his commission of the commitment offense' supported a denial of parole. (*Shaputis I, supra,* 44 Cal.4th at p. 1260.) Thus, we have expressly recognized that the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*In re Shaputis*, *supra*, 53 Cal.4th 192, 218.)

---

[11] In our decision affirming defendant's last conviction, we stated that "notwithstanding appellant's assertion to the contrary, the evidence of guilt was not at all close. Appellant gave too many conflicting and preposterous explanations of his behavior. This was not a case of simple conflict between two disputed versions of events. Appellant's behavior and his explanations were irreconcilable with innocence." (*People v. Davis, supra,* A086052.) In his brief, defendant attempts to mitigate this factor by citing a number of decisions in the parolee release context where we have accepted an inmate's inability to remember the details of the commitment offense. (See *In re Stoneroad* (2013) 215 Cal.App.4th 596, 628-629 and decisions cited.) But defendant does not claim loss of memory. To the contrary, he still insists on his complete innocence. A willful refusal to admit culpability that is blindingly apparent to all but the defendant clearly differs from an inability to remember.

18

Given defendant's history of returning to criminal conduct—specifically armed robbery—after twice being granted parole, there is no firm basis for believing that his brother could, and might not even be present to, stop defendant from succumbing to yet another armed robbery impulse. It is clear Judge Mallach thought defendant was unduly optimistic about his chances of smoothly and quickly reentering the job market. With no demonstrated job skills, no firm prospects for employment, a very appreciable possibility that there would be no family member restraining his rage and aggression, defendant's prospects were far from promising. That, together with his criminal history could, in the exercise of Judge Mallach's discretion, amply support the conclusion that if released defendant "would pose an unreasonable risk of danger to public safety."

**Proposition 47 Does Not Impact Our Analysis**

On November 10, 2014, nine days prior to the date for oral argument, defendant sought leave to file a supplemental brief on the issue of whether passage of Proposition 47 at the November 4, 2014 general election effected a fundamental redefinition of what constitutes "unreasonable risk of danger to public safety." A full round of new briefing was devoted to this issue.

Defendant's position is founded on Proposition 47 adding section 1170.18, subdivision (c) of which provides: "As used throughout this Code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." The cited clause enumerates eight felonies or classes of felonies:

"The defendant suffered a prior serious and/or violent felony conviction, as defined in subdivision (d) of this section, for any of the following felonies:

"(I) A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code.[12]

---

[12] Which provides: " 'Sexually violent offense' " means the following acts when committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the

19

"(II) Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by Section 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by Section 289.

"(III) A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288.

"(IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive.

"(V) Solicitation to commit murder as defined in Section 653f.

"(VI) Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245.

"(VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418.

"(VIII) Any serious and/or violent felony offense punishable in California by life imprisonment or death." (§ 667, subd. (e).)[13]

Defendant believes that the language "As used throughout this Code" has the consequence of making the Proposition 47 definition of "unreasonable risk of danger to public safety" the only one in the entire Penal Code, thus making it the one to be used in applying subdivision (f) of section 1170.126. Defendant's experienced counsel does not try to sugarcoat the likely consequences if his argument prevails: "By tethering the dangerousness standard to the section 667(e)(2)(C)(iv) list, rather than 'serious' or

victim or any other person, and that are committed on, before, or after the effective date of this article and result in a conviction or a finding of not guilty by reason of insanity, as defined in subdivision (a): a felony violation of Section 261, 262, 264.1, 269, 286, 288, 288a, 288.5, or 289 of the Penal Code, or any felony violation of Section 207, 209, or 220 of the Penal Code, committed with the intent to commit a violation of Section 261, 262, 264.1, 286, 288, 288a, or 289 of the Penal Code."

[13] As already mentioned, section 667 is one of the two Three Strike statutes. The other, section 1170.12, has identical language in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (c).

'violent felonies' generally, Proposition 47 provides that a court may only deny resentencing to an eligible inmate if it finds 'an unreasonable risk' that he will commit one of those egregious offenses. A more generalized risk of recidivism or even of violent recidivism will not satisfy that standard and will not permit a court to deny resentencing. Thus, a perceived risk that the inmate might commit some other felony, such as robbery or burglary, would not come within that definition and would not allow a court to deny resentencing." Thus, defendant continues, because the Proposition 47 definition governs, Judge Mallach's analysis was misguided, and the matter must be remanded to her, but not so that she may conduct a new analysis according to section 1170.18, subdivision (c). No, defendant sees himself as so far outside the Proposition 47 definition that we must direct Judge Mallach to grant his petition for resentencing because there is "not a scintilla of evidence . . . that [he] posed an 'unreasonable risk' of committing any of the extraordinarily aggravated offenses identified in subdivision (e)(2)(C)(iv) of section 667." Defendant's argument will not prevail, as we cannot conclude that the drafters of Proposition 47, or the electorate that approved it, intended it to rework the procedures established only two years before to deal with resentencing Three Strike offenders.

It may be acknowledged that the result for which defendant contends is not completely off base if considered solely as a matter of grammatical construction, for Proposition 47's definition of "unreasonable risk of danger to public safety" is clearly tied to the words "As used throughout this Code." (See fn. 14, *ante*.) However, such a literal construction is not to be adopted if it conflicts with the voters' intent shown in the official ballot pamphlet. (*People v. Briceno* (2004) 34 Cal.4th 451, 459; *People v. Osuna*, *supra*, 225 Cal.App.4th 1020, 1033-1034.) And nothing in the official ballot pamphlet for Proposition 47 hints at any impact on the procedure for resentencing Three Strike inmates. The explanation for that omission is plain.

Proposition 47 was intended to reduce penalties "for certain nonserious and nonviolent property and drug offenses from wobblers or felonies to misdemeanors." Those crimes were identified as "Grand Theft," "Shoplifting," "Receiving Stolen

21

Property," "Writing Bad Checks," "Check Forgery," and "Drug Possession." (Voter Information Guide, Gen. Elect. (Nov. 4, 2014) analysis by the Legislative Analyst pp. 35-36.) "This measure allows offenders currently serving felony sentences *for the above crimes* to apply to have their felony sentences reduced to misdemeanor sentences. . . . In addition, the measure states that a court is not required to resentence an offender currently serving a felony sentence if the court finds it likely that this offender will commit a specified severe crime." (*Id*. at p. 36, italics added.) This was echoed by the proponents of Proposition 47, who argued the measure "is sensible" in that it "Stops wasting prison space on petty crimes and focuses law enforcement resources on violent and serious crime by changing low-level, nonviolent crimes such as simple drug possession and petty theft from felonies to misdemeanors." (*Id*. at p. 38, argument in favor of Prop. 47.) In sum, a key part of Proposition 47 is the resentencing procedure of section 1170.18 that is clearly modeled on section 1170.126, but there is no mention of the passage of Three Strikes Reform Act only two years past. [14]

Additionally, literal application of Proposition 47's definition of "unreasonable risk of danger to public safety" would no longer allow a court to consider the galaxy of factors, including, for example, the "suitability" and "unsuitability" factors used by the Board of Parole Hearings (§ 3041; Cal. Code Regs., tit. 15, § 2402, subds. (a), (c), (d.)), or the evidence such as that relied on by Judge Mallach here. And, one must wonder, what would be left of that provision in section 1170.126 expressly granting the court the power to rely on "*Any other evidence the court, within its discretion, determines to be relevant* in deciding whether a new sentence would result in an unreasonable risk of

---

[14] There are references to the Three Strike statutes, but no apparent aim to undermine its application. (See Voter Information Guide, Gen. Elect., *supra*, text of Prop. 47, §§ 5 adding § 459.5 ["Shoplifting shall be punished as a misdemeanor, except that a person with one or more prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 . . . may be punished" as a felony"], 6 amending § 473 [same for forgery], 7 amending § 476a [check forgery], 8 adding § 490.2 [grand theft], 9 amending § 496 [receiving stolen property], §§ 11-13 amending Health & Saf. Code, §§ 11350, 11357, 11377 [possession of controlled substances].)

22

danger to public safety." (§ 1170.126, subd. (g)(3), italics added.)  Defendant's argument would eviscerate this provision, as a court would be restricted to weighing *only* the likelihood that the petitioner if released would commit one of the offenses specified in clause (iv).

It makes no sense to confine the court to consider possibilities that have no connection to the actual realities of a petitioner's situation.  It seems illogical that the drafters of Proposition 47—with the Three Strikes Reform Act clearly in mind—would use language that would so significantly change the very procedure for felonies that they were seeking to emulate and extend to misdemeanors.  If defendant's contention prevailed, he acknowledges the court could only inquire whether the petitioning inmate "could . . . be deemed to pose a risk of [committing] one of the extreme offenses enumerated in section 677, subdivision (e)(2)(C)(iv)," which even he concedes is a "a very narrow definition of 'unreasonable risk of danger to public safety.' "  And, as indicated, defendant admits that the logic of his position is that he is so far outside Proposition 47's definition that Judge Mallach would essentially have no choice but to grant his petition.

If we agreed with defendant that Proposition 47 governs, we would be compelled to agree with defendant's contention that on remand Judge Mallach would have to rule for him.  And that such would be the result demonstrates why defendant's argument cannot prevail—why Proposition 47 cannot apply.  Were defendant correct, a court considering a petition from a serial pyromaniac could not consider if the inmate might commit further arson; or one hearing a petition from a sadist could not consider whether she might again commit mayhem.  In short, a court could not examine whether a career criminal might return to the crime he knows best—in our very case here, could not ask whether an inmate with a history of armed robbery might again rob.  No, those defendants would have to be released unless the court had a basis for concluding each is likely to explore new criminal avenues by committing a clause (iv) offense.  This, we submit, is the height of folly, the consequences of which would be a radical reduction of

23

the sentencing court's heretofore expansive discretion to consider whether an inmate's release posed a danger to public safety. This, we cannot allow.

Courts are reluctant to recognize a significant statutory shift from cryptic language or such an off-hand reference. " '[W]e think it highly unlikely that the Legislature would make such a significant change . . . without so much as a passing reference to what it is doing. The legislature "does not, one might say, hide elephants in mouseholes." (*Whitman v. American Trucking Associations* (2001) 531 U.S. 457, 468.)' ([Citations]; see also *In re Christian S.* (1994) 7 Cal.4th 768, 782 ['We are not persuaded the Legislature would have silently, or at best obscurely, decided so important and controversial a public policy matter and created a significant departure from the existing law.'].)" (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1171.) There is no reason voter initiatives should receive any different treatment.

What we said in 1983 is no less true today: " 'It has been called a golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result.' [Citations.]" (*Armstrong v. County of San Mateo* (1983) 146 Cal.App.3d 597, 615.) Common sense must have some claim. (See *California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 ["Interpretative constructions which . . . defy common sense . . . are to be avoided."]; *Guardianship of Simpson* (1998) 67 Cal.App.4th 914, 936 ["As judges, we are . . . not charged with following legal logic to the point where it defies common sense."]; cf. Holmes, The Common Law (13th ed. 1938) 1 ["The life of the law has not been logic: it has been experience."].) Before we would put blinders on a court considering whether to release a three strike felon back on the streets, we would need the most compelling proof that unreasonable and counterintuitive result was intended by the voters. Defendant has not satisfied that burden.

It has been 147 years since Justice Stephen Field stated the limits of literalism: "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. . . .

24

The reason of the law in such cases should prevail over its letter." (*United States v. Kirby* (1868) 74 U.S. 482, 486-487.) The wisdom of these words has been continually recognized by our Supreme Court. (E.g., *In re Michele D.* (2002) 29 Cal.4th 600, 607; *People v. Daniels* (1969) 71 Cal.2d 1119, 1130; *People v. Oliver* (1961) 55 Cal.2d 761, 767; *People v. Ventura Refining Co.* (1928) 204 Cal. 286, 291; *Ex parte Lorenzen* (1900) 128 Cal. 431, 439-440.) We follow that principle by concluding that the five words "As used throughout this Code" were not intended by the voters to hamstring the Three Strikes Reform Act.

      The order is affirmed.


                               _____

                               Richman, J.


We concur:


_____
Kline, P.J.


_____
Stewart, J.

| | |
|---|---|
| Trial Court: | Superior Court for the County of San Mateo |
| Trial Judge: | Honorable Barbara Mallach |
| Attorney for Defendant and Appellant: | Richard Such, under appointment by the Court of Appeal |
| Attorneys for Plaintiff and Respondent: | Kamala D. Harris, Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Eric D. Share, Supervising Deputy Attorney General, Huy T. Luong, Deputy Attorney General |