Filed 8/31/20

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E071218 |
| v. | (Super.Ct.No. SWF1807006) |
| MARK JASON HARTLAND, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Stephen J. Gallon, Judge.
Affirmed and remanded with directions.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and
Appellant.

Xavier Becerra, Attorney General, Lance Winters, Chief Assistant Attorney
General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, and Randall D.
Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is
certified for publication with the exceptions of parts B. and C. of the DISCUSSION.

1

A jury convicted Mark Jason Hartland of one count each of kidnapping, assault by means likely to produce great bodily injury, and domestic violence resulting in a traumatic condition. (Pen. Code, §§ 207, subd. (a), 245, subd. (a)(4), 273.5, subd. (a).)[1] In a bifurcated proceeding, the trial court found a prior conviction allegation true as both a prior strike (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)) and a prior serious felony (§ 667, subd. (a).) Hartland was sentenced to 21 years in state prison.

Relying on *People v. Oliver* (1961) 55 Cal.2d 761, 765 (*Oliver*) and *In re Michele D.* (2002) 29 Cal.4th 600 (*Michele D.*), Hartland argues that the trial court prejudicially erred by failing to instruct the jury that if the kidnapping victim was so intoxicated as to lack the capacity to consent, then Hartland could not be found guilty of kidnapping unless he acted with illegal purpose or illegal intent. In the published portion of our opinion, we reject Hartland's argument because we decline to extend the doctrine of *Oliver* and *Michele D.* to the kidnapping of an intoxicated, resisting, adult victim.

In the unpublished portion of our opinion, we address issues concerning sentencing and custody credits. We remand for the trial court to exercise its newly gained discretion to dismiss or strike the prior serious felony conviction. We also order the correction of clerical errors in the abstract of judgment and the sentencing minute order. We otherwise affirm the judgment.

---

[1] Unlabeled statutory references are to the Penal Code.

BACKGROUND

A. *New Year's Eve 2017—Incident with A.S.*

Hartland and A.S. started dating in 2016 and had a six-month-old son together by December 2017. Early in the afternoon on December 31, 2017, the couple and their son went to spend New Year's Eve at the home of their friends, Breanna M. and Chris V. Between approximately 3:00 p.m. and midnight, A.S. drank four to six bottles of hard cider.[2] Hartland drank beer throughout the day and had started drinking before A.S. picked him up.

Shortly before midnight, Hartland and A.S. got into an argument about a post on social media. Hartland threw his phone. A.S. went to check on the baby, grabbed her wallet and her phone, and left the house. She told Hartland that she was leaving "to go get an Uber" and that she would see him the next morning. She "just wanted to get away" and did not want the argument to "escalate," as had happened in the past. She wanted to take her son with her but worried that doing so would result in a "bigger argument" between herself and Hartland. She was worried that Hartland was going to follow her because she had "tried to leave before and he ha[d]n't let [her] leave."

A.S. walked for 15 minutes to a liquor store parking lot a couple of blocks away. She did not think that she could safely drive. She "could feel the effects of the alcohol" and was "buzzed" but was not "wasted." Breanna described A.S. as being "drunk," based on A.S. acting "louder," "more obnoxious," and "more bubbly" than the few other times

---

[2]    Breanna testified that she also saw A.S. drink more than one glass of sangria. A.S. denied drinking any wine that day.

that they had been around each other. A.S. was familiar with the area in which Breanna and Chris lived and considered it unsafe.

Hartland followed A.S. in her car. He pulled into the liquor store parking lot and yelled at her to get into the car. A.S. refused, saying, "No, I'm not going. I'm not going." Hartland insisted and got out of the car. A.S. screamed for help. Hartland grabbed her and tried to push her toward the car. She screamed, "I don't want to go. I want to go home," "at the top of [her] lungs." She flailed her arms and attempted to drop to the ground. Hartland was behind her, picked her up, and dragged her to the car. Another car pulled up and someone exited that car. Hartland lifted A.S. up and threw her into the car. He ran around to the driver's side and drove away. A.S. was afraid and thought that she might die.

When in the car, A.S. continued to scream for Hartland to let her go. Hartland told her to shut up. Hartland grabbed A.S. by the throat and began choking her while he continued driving. He held her by the neck so that she was hunched over into his lap. A.S. felt like she could not breathe, and she feared for her life. At some point A.S. opened the passenger door to jump out of the moving car. She thought it would be better to suffer an injury from "jumping out of the car than get strangled by him."

Hartland grabbed A.S. to prevent her from jumping out. He threw her against the passenger side door, and her head hit the window. Hartland stopped the car and used one hand to grab A.S. by the neck again. A.S. could not breathe. He held onto her neck for approximately five seconds.

A.S. exited the car shortly after Hartland let go of her neck. Hartland exited too and blocked A.S. from walking away by shoving her with his chest and not allowing her to step around him. This lasted for approximately five to 10 minutes, but she eventually was able to walk back to Breanna and Chris's house. She saw both of them and told them that Hartland had hit her.

When Hartland got back to the house, Chris went outside to talk to him, and A.S. could hear Hartland and Chris yelling at each other. Hartland came upstairs to talk to A.S., but she did not want to speak to him. Hartland took the baby, so A.S. left the house again, walked down the street, and called 911.

A sheriff's deputy arrived at approximately 1:00 a.m. and spoke with A.S. A.S. had a bruise on her neck, a scratch on her face, and redness on her neck, her collarbone, the right side of her face, and her jaw. The sheriff's deputy could tell that A.S. "had been drinking" but did not think that she was "heavily intoxicated." She spoke coherently without slurring her words, was not swaying side to side, and did not have a "strong odor[]" of alcohol. The deputy also interviewed Breanna. Breanna told him that A.S. was welcome to spend the night at her house even though A.S. was "probably sober enough to drive."

B. *Hartland's Admitted Prior Violence Against A.S. and Other Women*

Hartland admitted that he had physically assaulted A.S. on multiple occasions. A.S. described two of those incidents, one in 2016 and one in September 2017. On both occasions, Hartland had been drinking. During the September 2017 incident, Hartland

grabbed A.S., took her phone, pulled her hair, tackled her to the ground, scratched or hit her, and bit her. A.S. attempted to get away from him, but Hartland would not let her leave the house.

Three women whom Hartland had dated between 2009 and 2016 testified. Each of them recounted multiple incidents of Hartland physically assaulting them. Hartland admitted that he had assaulted all of these women. The parties stipulated that he was convicted of misdemeanor battery against a girlfriend in 2015. He also admitted that he had a greater propensity for acting violently toward his girlfriends when he was drinking.

C. *Hartland's Testimony*

Hartland testified that although he was too intoxicated to drive safely on the night in question, he drove around looking for A.S. because Breanna and Chris told him that it was not safe for her to be walking around that neighborhood. (Both Breanna and Chris testified that they did tell Hartland that.) When Hartland found A.S. in the parking lot, A.S. started screaming profanities at him. He got out of the car, placed his hand on her back, and guided her toward the car while the two argued. When they were within six feet of the car, A.S. "start[ed] freaking out." She jerked back, hit Hartland, flailed around, and threw herself onto the ground. Hartland picked up A.S. by her waist, opened the car door, and pushed her into the car. A.S. was screaming at Hartland, telling him to let her go and that she did not want to go back to Breanna and Chris's house. According to Hartland, he placed A.S. in the car against her wishes because "[i]t was not safe for her to be out there."

6

While driving back to the house, Hartland and A.S. continued to argue. A.S. started crying and threatened to kill herself. She opened the car door and tried to jump out. Hartland grabbed her by the hair and pulled her back inside the car. They were travelling at approximately 20 miles per hour.

Hartland pulled A.S. onto his lap and held her down by her neck because the car door remained open. Hartland closed the door and parked two or three houses down the street from Breanna and Chris's house. He turned off the engine, and they remained in the car arguing. Hartland called A.S. a "bitch," and she hit him in the face. Hartland grabbed her by the neck and held her down in his lap. He then lifted her up by her neck and threw her off of him. A.S. hit the passenger side window.

After Hartland and A.S. both exited the car, A.S. attempted to run up the street while screaming and yelling. Hartland blocked her from running up the street for approximately 20 minutes until Breanna and Chris came outside. Hartland eventually followed A.S. inside and tried to talk to her, but she refused. A.S. stormed out of the house again, and Hartland did not follow her.

Hartland spoke with a sheriff's deputy that morning. Hartland told the deputy that his friends had told him to go to bed; he did not say that they had told him to go after A.S. because of the unsafe neighborhood. Hartland told the deputy that he had gently escorted A.S. to the car without using any force. He also told the deputy that A.S. had hit him and that he may have hit her in response to "try[] to push her off."

7

DISCUSSION

A. *Kidnapping Instruction*

For the kidnapping offense, the trial court instructed the jury with CALCRIM No. 1215, which, as given to the jury, provided that the prosecution had to prove the following elements: (1) "The defendant took, held, or detained another person by using force or by instilling reasonable fear;" (2) "Using that force or fear, the defendant moved the other person or made the other person move a substantial distance;" (3) "The other person did not consent to the movement;" and (4) "The defendant did not actually and reasonably believe that the other person consented to the movement." On appeal, Hartland contends that the trial court prejudicially erred by not also instructing the jury that if A.S. lacked capacity to consent because she was intoxicated, then Hartland could not be found guilty of kidnapping unless he acted with illegal purpose or illegal motive. We conclude that Hartland's contention lacks merit.[3]

A trial court is obligated to "instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) Whether the jury was properly instructed on the elements of an offense is a mixed question of fact and law that is

---

[3] Hartland did not object to the kidnapping instruction that was given or request that it be modified in any way. We reject the People's argument that Hartland consequently forfeited these arguments on appeal. Hartland claims that his substantial rights were affected by the instruction because it allowed a guilty finding without considering what he contends are necessary elements of the offense in the circumstances presented here. As Hartland correctly points out, the "claim therefore is not of the type that must be preserved by objection." (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)

8

predominantly legal and therefore subject to de novo review. (*People v. Cole* (2004) 33 Cal.4th 1158, 1208.) "'[A] trial judge must only give those instructions which are supported by substantial evidence,' and 'has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence.'" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823.)

In general, "to prove the crime of kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance." (*People v. Jones* (2003) 108 Cal.App.4th 455, 462 (*Jones*); § 207, subd. (a).) In *People v. Oliver* (1961) 55 Cal.2d 761, 765 (*Oliver*), however, the Supreme Court recognized that the consent requirement for kidnapping "presents special problems when the victim is an infant too young to give or withhold consent." (*People v. Hill* (2000) 23 Cal.4th 853, 855 (*Hill*); *Oliver*, *supra*, at p. 768.) "Many situations readily suggest themselves under which a minor, unable to give his [or her] consent because of his [or her] immature years, might be forcibly taken and transported by an adult for a good or innocuous purpose, and in which it would be unthinkable that the adult should be held guilty of kidnapping." (*Oliver*, at p. 765.) To avoid such a result, the Supreme Court in *Oliver* held that a person could be guilty of kidnapping a person "who by reason of immaturity or mental condition is unable to give his [or her] legal consent thereto" "only if the taking and carrying away is done for an illegal purpose or with an illegal

9

intent." (*Id.* at p. 768; *Hill, supra,* at p. 855.) *Oliver* involved the kidnapping of a two-year old child. (*Oliver,* at p. 763.)

More recently, in *In re Michele D.* (2002) 29 Cal.4th 600, 603 (*Michele D.*), a case involving the kidnapping of a 12-month-old child, the Supreme Court reaffirmed the holding in *Oliver, supra,* 55 Cal.2d 761 and recognized "that infants and young children are [also] in a different position vis-a-vis the force requirement for kidnapping than those who can apprehend the force being used against them and resist it." (*Id.* at p. 610.) The Court concluded that "the amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent." (*Ibid.*)

In 2003, the Legislature added subdivision (e) to section 207 to incorporate the holding of *Michele D.* (Stats. 2003, ch. 23, § 1; § 207, subd. (e) ["For purposes of those types of kidnapping requiring force, the amount of force required to kidnap an unresisting infant or child is the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent"].) CALCRIM No. 1201 likewise incorporates the distinct requirements of force and consent for kidnapping cases involving "a child/ [or] a person with a mental impairment who was not capable of giving legal consent to the movement" as set forth in *Oliver* and *Michele D.,* including that "[t]he defendant used (physical force/deception) to take and carry away an unresisting (child/ [or] person with a mental impairment)." (CALCRIM No. 1201.)

10

Hartland contends that *Oliver* and *Michele D.* stand for the proposition that whenever there is sufficient evidence "to raise a reasonable doubt as to the victim's legal capacity to consent and substantial evidence of the defendant's innocent intent, the question must be presented to the jury subject to the beyond a reasonable doubt standard." He further contends that there is a reasonable doubt as to the victim's capacity whenever the victim's judgment was "impaired by intoxication," as shown in this case by the facts that A.S. had been drinking and that she went out walking alone, late at night, in a dangerous neighborhood. Given those facts and Hartland's testimony that he was merely trying to help A.S. by removing her from the danger of the liquor store parking lot and bringing her to the safety of their friends' home, Hartland argues that the jury should have determined whether he harbored the necessary illegal purpose or illegal intent under *Oliver* and *Michele D.*

We reject Hartland's argument because there is no authority for the proposition that the *Oliver*/*Michele D.* requirement of illegal purpose or illegal intent applies to the kidnapping of an intoxicated, resisting, adult victim. *Oliver* involved an unresisting two-year-old child. (*Oliver*, *supra*, 55 Cal.2d at p. 763.) *Michele D.* involved an unresisting 12-month-old child. (*Michele D.*, *supra*, 29 Cal.4th at p. 603.) We are aware of only one published decision that applies the *Oliver*/*Michele D.* doctrine to the kidnapping of an adult victim, and in that case the victim was unresisting, completely incapacitated by intoxication, and only intermittently conscious. (*People v. Daniels* (2009) 176 Cal.App.4th 304, 308-309 (*Daniels*).) Section 207, subdivision (e), and CALCRIM No.

11

1201 likewise apply only to an unresisting child or an unresisting mentally impaired person.

At oral argument, Hartland's counsel contended that we are reading *Oliver* too narrowly, because dicta in *Oliver* addresses the kidnapping of adult victims who lack the capacity to consent. We are not persuaded. It is true that the Supreme Court in *Oliver* discussed some hypotheticals involving adult victims even though the case before the Court involved a two-year-old child. For example, the opinion states that if a good Samaritan "forcibly carr[ies] a helplessly intoxicated man lying in the middle of the highway to a place of greater safety" or "forcibly take[s] a delirious man or one who is unconscious to a hospital or to a doctor," then the good Samaritan would not be guilty of kidnapping, because "evil and unlawful purpose" would be lacking. (*Oliver*, *supra*, 55 Cal.2d at p. 766.) But those hypotheticals are distinguishable on two grounds. First, they do not involve victims who are resisting. The victims are described as "helplessly intoxicated," "delirious," or "unconscious," but never as resisting. (*Ibid.*) Second, the victims in the Supreme Court's hypotheticals are incapacitated to a degree that goes far beyond lack of capacity to consent—again, they are "helplessly intoxicated," "delirious," or "unconscious." (*Ibid.*) For both of those reasons, the hypotheticals do not cast doubt on our conclusion that *Oliver*'s holding should not be extended to intoxicated, resisting, adult victims.

In support of his position, Hartland also cites *People v. Giardino* (2000) 82 Cal.App.4th 454 (*Giardino*) concerning rape of an intoxicated person. We agree that

both *Giardino* and the analogy with rape are instructive, but they do not aid Hartland.  As *Giardino* explains, in a rape case "the consent defense fails if the victim either did not actually consent or lacked the capacity to give legally cognizable consent." (*Id.* at p. 460.)  Thus, for example, if a rape victim actively resists, then the victim does not actually consent, and that is sufficient to prove the element of lack of consent.  In those circumstances, it is no defense to claim that the victim was so intoxicated as to lack the capacity to give *or withhold* consent, so the victim's withholding consent was legally invalid in the same way that a victim's giving actual consent may be legally invalid if the victim is so intoxicated as to lack capacity.  In short, "No" means no, even if the victim is intoxicated.  The perpetrator does not get to decide that the victim's overt withholding of consent is of no consequence because of the victim's intoxication.

Analogous reasoning applies to the kidnapping of a resisting adult victim.  The resistance means the victim does not actually consent to being transported, and that is sufficient to prove the element of lack of consent.  It is no defense to claim that the victim was so intoxicated that the withholding of consent was legally invalid and that the perpetrator acted with innocent intent.

At oral argument, Hartland's counsel took issue with our reliance on the resistance of the victim, arguing that the *Oliver*/*Michele D.* doctrine should apply to forcible transportation of resisting adults in certain exigent circumstances.  For example, a good Samaritan who drags a mother out of a burning building when the mother resists because she believes her child is trapped inside should not, on Hartland's counsel's argument, be

13

guilty of kidnapping.  We find the argument unpersuasive because the intuitive force of such hypotheticals involving exigent circumstances has nothing to do with consent or lack of capacity.  Rather, the argument for exonerating the good Samaritans in such hypotheticals would be based on the affirmative defense of necessity.  (See *People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035 [stating the elements of the necessity defense].)  Our conclusion that the *Oliver*/*Michele D.* doctrine does not apply to intoxicated, resisting, adult victims does not affect the availability of the necessity defense, and the availability of that defense does not undermine our conclusion about the scope of *Oliver* and *Michele D.*

We recognize, as the Supreme Court observed in *Oliver*, that there are circumstances in which a child "might be forcibly taken and transported by an adult for a good or innocuous purpose, and in which it would be unthinkable that the adult should be held guilty of kidnapping." (*Oliver*, *supra*, 55 Cal.2d at p. 765.)  Moreover, there are circumstances in which the court's observation might be true of a resisting child or even a resisting adult.  A parent who takes a resisting child to school or to the doctor is presumably not guilty of kidnapping, and the same would presumably be true of a conservator who takes a resisting, disabled, adult conservatee to the doctor or to adult daycare.  (Cf. *Scott S. v. Superior Court* (2012) 204 Cal.App.4th 326, 341.)  But in those situations, there is a preexisting and legally recognized relationship (parent/child or conservator/conservatee) that gives certain individuals the authority to make decisions for other individuals who lack the legal capacity to make their own.  That factor is not

14

present in the case of a merely intoxicated adult who is not otherwise disabled (and hence is not conserved).

For all of these reasons, we decline Hartland's invitation to extend the *Oliver/Michele D.* doctrine to the case of an intoxicated, resisting, adult victim. The trial court did not err by failing to instruct the jury that if A.S. lacked the capacity to consent, then Hartland was not guilty of kidnapping unless he acted with illegal purpose or illegal intent.

B. *Serious Felony Conviction Enhancement*

Effective January 1, 2019, Senate Bill No. 1393 (2017-2018 Reg. Sess.) amended section 667, subdivision (a), and section 1385, subdivision (b), to allow a court to strike or to dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, § 2, eff. Jan. 1, 2019; *People v. Zamora* (2019) 35 Cal.App.5th 200, 208 (*Zamora*).) At the time of Hartland's sentencing, the trial court was required to impose a five-year enhancement for his prior serious felony conviction. (Former § 667, subd. (a)(1).) The parties agree, and this court has already held that this change in law applies retroactively to those like Hartland whose sentences were not final when Senate Bill No. 1393 became effective. (*Zamora*, *supra*, at p. 208; *People v. Garcia* (2018) 28 Cal.App.5th 961, 971-973 (*Garcia*).)

The People nevertheless oppose remand. They contend that resentencing is unwarranted because "it is clear from the record that the trial court would not have dismissed [Hartland's] serious felony prior even if had the power to do so." (Boldface

and initial capitalization omitted.)  This argument is based on the trial court's denial of Hartland's motion under section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*), the sentences imposed, and comments the judge made at both the motion hearing and the sentencing hearing.

In general, "when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228; *People v. Metcalf* (1996) 47 Cal.App.4th 248, 252 ["Since the trial court affirmatively indicated, and erroneously believed, that it had no discretion to [strike] a prior offense, we must 'remand the case to the trial court to permit it to resentence defendant with an accurate view of its powers'"].)  That is because "[d]efendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court." (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.)

However, a remand for resentencing is unnecessary "if the record shows that the sentencing court clearly indicated that it would not, in any event, have exercised its discretion" to reach a different result.  (*Romero*, *supra*, 13 Cal.4th at p. 530, fn. 13; *Garcia*, *supra*, 28 Cal.App.5th at p. 973, fn. 3.)  "The trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so.  Rather, we review the trial court's statements and sentencing

decisions to infer what its intent would have been." (*People v. Jones* (2019) 32 Cal.App.5th 267, 273 (*Jones*); *People v. Johnson* (2019) 32 Cal.App.5th 26, 68-69.)

Here, the record does not clearly indicate that the trial court would have declined to exercise its discretion to strike the prior serious felony conviction. Denial of a *Romero* motion does not necessarily indicate how a trial court would exercise its discretion under section 1385, subdivision (b), to strike the prior serious felony conviction for sentencing purposes. (*People v. Bell* (2020) 47 Cal.App.5th 153, 200 (*Bell*).) In the present case, when the trial court denied the *Romero* motion, it concluded after weighing numerous factors, including the violence involved in the prior offense of first degree burglary and the violence involved in the present offenses against A.S., that "it would be an abuse of discretion to strike [Hartland's] prior at this time."

Then, in denying probation, the trial court considered aggravating factors such as the severity of the crime and stated, "The crime involved great violence, great bodily harm, threat of bodily harm, and other acts disposing a high degree of cruelty, viciousness, or callousness." The trial court also considered mitigating circumstances, such as the role of drugs and alcohol and "ADHD" in Hartland's life and that one of his previous girlfriends who testified against him also wrote a character letter in support of him for sentencing. Overall, however, the trial court found that the aggravating factors substantially outweighed the mitigating factors. The trial court then imposed the upper term for each of the three offenses.[4]

---

[4] The sentences for the assault and the domestic violence convictions were stayed under section 654.

While those decisions and statements suggest that the judge might not be inclined to impose a shorter sentence by striking the prior serious felony conviction, we do not find them dispositive on the issue. The trial court's statements about aggravating factors were made in the context of denying the *Romero* motion and in explaining why probation was not appropriate. The trial court did not make any "*general* statement about defendant's aggregate term." (*Bell*, *supra*, 47 Cal.App.5th at p. 200; cf. *Jones*, *supra*, 32 Cal.App.5th at p. 275 [remand for resentencing futile because the trial court stated that it "took 'great satisfaction' in imposing the 'very lengthy sentence' it imposed"].) Moreover, although the trial court imposed the longest sentence that it could and rejected imposing a more lenient sentence, striking or dismissing the enhancement for sentencing purposes now would leave Hartland with a 16-year sentence, which is one year longer than if the trial court had imposed the midterm sentence for the kidnapping offense.[5] There is no clear indication in the record whether the trial court would consider that one additional year to be a satisfactorily harsher sentence than the shorter option that it previously rejected.

We therefore cannot say that the record clearly indicates how the trial court would exercise its discretion to dismiss or strike the prior serious felony conviction

---

[5] If the trial court had imposed the midterm of five years, that would have been doubled to 10 years because of the prior strike. (§§ 208, subd. (a), 667, subd. (e)(1).) Along with the then-mandatory five-year enhancement for the prior serious felony conviction, the aggregate sentence would have been 15 years.

enhancement for sentencing purposes. We remand so that the trial court can exercise its newly gained discretion to dismiss or strike the serious felony enhancement.

C. *Actual Custody Credits*

Hartland argues and the People agree that the sentencing minute order and the abstract of judgment must be corrected to reflect the trial court's oral pronouncement of Hartland's actual custody credits. We concur. When "there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385; *People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.) At sentencing, the trial court awarded Hartland 243 days of actual custody credits and 36 days of conduct credits, totaling 279 days. Neither party disputes the accuracy of this calculation. The sentencing minute order and the abstract of judgment, however, inaccurately provide that Hartland received 29 days of conduct credit and 272 days of total credit. The sentencing minute order and the abstract of judgment must be amended to include the correct amount of credit for the time that Hartland served.

## DISPOSITION

The matter is remanded for the trial court to exercise its discretion under section 667, subdivision (a), and section 1385, subdivision (b), to determine whether to dismiss or strike the serious felony conviction enhancement. The trial court is further ordered to (1) amend the abstract of judgment and the sentencing minute order to reflect that Hartland received 36 days of conduct credits and a total of 279 days of credit, and (2)

19

forward a copy of the amended abstract of judgment to the California Department of

Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

MENETREZ_____
J.



We concur:

CODRINGTON_____
                Acting P. J.
SLOUGH_____
                J.